## KANSAS *v.* HENDRICKS

No. 95–1649.   Argued December 10, 1996—Decided June 23, 1997*

*Together with No. 95–9075, *Hendricks* v. *Kansas,* also on certiorari to the same court.

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*, p. 371. BREYER, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined, and in which GINSBURG, J., joined as to Parts II and III, *post*, p. 373.

*Carla J. Stovall*, Attorney General of Kansas, argued the cause for the petitioner in No. 95–1649 and respondent in No. 95–9075. With her on the briefs were *Stephen R. McAllister*, Special Assistant Attorney General, *Bernard Nash, James van R. Springer*, and *Laura B. Feigin*.

*Thomas J. Weilert* argued the cause for Hendricks in both cases. With him on the briefs were *James W. Ellis* and *David Gottlieb.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Washington et al. by *Christine O. Gregoire*, Attorney General of Washington, and *Sarah Blackman Sappington*, Assistant Attorney General, *Charles F. C. Ruff*, Corporation Counsel of the District of Columbia, *Sebastian Aloot*, Acting Attorney General of the Northern Mariana Islands, and by the Attorneys General for their respective jurisdictions as follows: *Jeff Sessions* of Alabama, *Malaetasi Togafu* of American Samoa, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Calvin E. Holloway, Sr.*, of Guam, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Pamela Fanning Carter* of Indiana, *Thomas J. Miller* of Iowa, *A. B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Peter Verniero* of New Jersey, *Tom Udall* of New Mexico, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Thomas W. Corbett, Jr.*, of Pennsylvania, *Pedro R. Pierluisi* of Puerto Rico, *Jeffrey B. Pine* of Rhode Island, *Charles Molony Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *Jan Graham* of Utah, *Jeffrey L. Amestoy* of Vermont, *Julio A. Brady* of the Virgin Islands, *James S. Gilmore III* of Virginia, and *William U. Hill* of Wyoming; for the State of Wisconsin by *James E. Doyle*, Attorney General, and *Sally L. Wellman* and *Mary E. Burke*, Assistant Attorneys General; for the Menninger Foundation et al. by *Philip Allen Lacovara, James C. Geoly*, and *Robert Teir;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Scott A. W. Johnson, Laura J. Buckland, Steven R. Shapiro, Christopher A. Hansen*, and *Bruce Winick;* for the American Psychiatric Association by *Richard G. Taranto;* for the National Association of Criminal Defense Lawyers et al. by *David A. Reiser, Jennifer P. Lyman, Barbara E. Bergman*, and *James F. Vano;* for the National Mental Health Association by *Ira A. Burnim;* for the Seattle-King County Defender Association et al. by *Robert C. Boruchowitz, Addie*

JUSTICE THOMAS delivered the opinion of the Court.

In 1994, Kansas enacted the Sexually Violent Predator Act, which establishes procedures for the civil commitment of persons who, due to a "mental abnormality" or a "personality disorder," are likely to engage in "predatory acts of sexual violence." Kan. Stat. Ann. § 59–29a01 et seq. (1994). The State invoked the Act for the first time to commit Leroy Hendricks, an inmate who had a long history of sexually molesting children, and who was scheduled for release from prison shortly after the Act became law. Hendricks challenged his commitment on, inter alia, "substantive" due process, double jeopardy, and ex post facto grounds. The Kansas Supreme Court invalidated the Act, holding that its precommitment condition of a "mental abnormality" did not satisfy what the court perceived to be the "substantive" due process requirement that involuntary civil commitment must be predicated on a finding of "mental illness." In re Hendricks, 259 Kan. 246, 261, 912 P. 2d 129, 138 (1996). The State of Kansas petitioned for certiorari. Hendricks subsequently filed a cross-petition in which he reasserted his federal double jeopardy and ex post facto claims. We granted certiorari on both the petition and the cross-petition, 518 U. S. 1004 (1996), and now reverse the judgment below.

I

A

The Kansas Legislature enacted the Sexually Violent Predator Act (Act) in 1994 to grapple with the problem of managing repeat sexual offenders.[1] Although Kansas al-

---

Hailstorks, John Stuart, Eric Janus, John T. Philipsborn, and Bernadette Foley; and for the Washington State Psychiatric Association by David A. Summers.

David B. Robbins filed a brief for the Association for the Treatment of Sexual Abusers as amicus curiae.

[1] Subsequent to Hendricks' commitment, the Kansas Legislature amended the Act in ways not relevant to this action. See, e. g., Kan. Stat.

ready had a statute addressing the involuntary commitment of those defined as "mentally ill," the legislature determined that existing civil commitment procedures were inadequate to confront the risks presented by "sexually violent predators." In the Act's preamble, the legislature explained:

> "[A] small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment pursuant to the [general involuntary civil commitment statute] . . . . In contrast to persons appropriate for civil commitment under the [general involuntary civil commitment statute], sexually violent predators generally have anti-social personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. The legislature further finds that sexually violent predators' likelihood of engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedure . . . is inadequate to address the risk these sexually violent predators pose to society. The legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the [general involuntary civil commitment statute]." Kan. Stat. Ann. § 59–29a01 (1994).

As a result, the legislature found it necessary to establish "a civil commitment procedure for the long-term care and

---

Ann. § 59–29a03 (Supp. 1996) (changing notification period from 60 to 90 days); § 59–29a04 (requiring state attorney general to initiate commitment proceedings).

treatment of the sexually violent predator." *Ibid.* The Act defined a "sexually violent predator" as:

> "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." § 59–29a02(a).

A "mental abnormality" was defined, in turn, as a "congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." § 59–29a02(b).

As originally structured, the Act's civil commitment procedures pertained to: (1) a presently confined person who, like Hendricks, "has been convicted of a sexually violent offense" and is scheduled for release; (2) a person who has been "charged with a sexually violent offense" but has been found incompetent to stand trial; (3) a person who has been found "not guilty by reason of insanity of a sexually violent offense"; and (4) a person found "not guilty" of a sexually violent offense because of a mental disease or defect. § 59–29a03(a), § 22–3221 (1995).

The initial version of the Act, as applied to a currently confined person such as Hendricks, was designed to initiate a specific series of procedures. The custodial agency was required to notify the local prosecutor 60 days before the anticipated release of a person who might have met the Act's criteria. § 59–29a03. The prosecutor was then obligated, within 45 days, to decide whether to file a petition in state court seeking the person's involuntary commitment. § 59–29a04. If such a petition were filed, the court was to determine whether "probable cause" existed to support a finding that the person was a "sexually violent predator" and thus eligible for civil commitment. Upon such a determination, transfer of the individual to a secure facility for professional evaluation would occur. § 59–29a05. After that evaluation,

a trial would be held to determine beyond a reasonable doubt whether the individual was a sexually violent predator. If that determination were made, the person would then be transferred to the custody of the Secretary of Social and Rehabilitation Services (Secretary) for "control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." § 59–29a07(a).

In addition to placing the burden of proof upon the State, the Act afforded the individual a number of other procedural safeguards. In the case of an indigent person, the State was required to provide, at public expense, the assistance of counsel and an examination by mental health care professionals. § 59–29a06. The individual also received the right to present and cross-examine witnesses, and the opportunity to review documentary evidence presented by the State. § 59–29a07.

Once an individual was confined, the Act required that "[t]he involuntary detention or commitment . . . shall conform to constitutional requirements for care and treatment." § 59–29a09. Confined persons were afforded three different avenues of review: First, the committing court was obligated to conduct an annual review to determine whether continued detention was warranted. § 59–29a08. Second, the Secretary was permitted, at any time, to decide that the confined individual's condition had so changed that release was appropriate, and could then authorize the person to petition for release. § 59–29a10. Finally, even without the Secretary's permission, the confined person could at any time file a release petition. § 59–29a11. If the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement.

## B

In 1984, Hendricks was convicted of taking "indecent liberties" with two 13-year-old boys. After serving nearly 10 years of his sentence, he was slated for release to a halfway

house. Shortly before his scheduled release, however, the State filed a petition in state court seeking Hendricks' civil confinement as a sexually violent predator. On August 19, 1994, Hendricks appeared before the court with counsel and moved to dismiss the petition on the grounds that the Act violated various federal constitutional provisions. Although the court reserved ruling on the Act's constitutionality, it concluded that there was probable cause to support a finding that Hendricks was a sexually violent predator, and therefore ordered that he be evaluated at the Larned State Security Hospital.

Hendricks subsequently requested a jury trial to determine whether he qualified as a sexually violent predator. During that trial, Hendricks' own testimony revealed a chilling history of repeated child sexual molestation and abuse, beginning in 1955 when he exposed his genitals to two young girls. At that time, he pleaded guilty to indecent exposure. Then, in 1957, he was convicted of lewdness involving a young girl and received a brief jail sentence. In 1960, he molested two young boys while he worked for a carnival. After serving two years in prison for that offense, he was paroled, only to be rearrested for molesting a 7-year-old girl. Attempts were made to treat him for his sexual deviance, and in 1965 he was considered "safe to be at large," and was discharged from a state psychiatric hospital. App. 139–144.

Shortly thereafter, however, Hendricks sexually assaulted another young boy and girl—he performed oral sex on the 8-year-old girl and fondled the 11-year-old boy. He was again imprisoned in 1967, but refused to participate in a sex offender treatment program, and thus remained incarcerated until his parole in 1972. Diagnosed as a pedophile, Hendricks entered into, but then abandoned, a treatment program. He testified that despite having received professional help for his pedophilia, he continued to harbor sexual desires for children. Indeed, soon after his 1972 parole, Hendricks began to abuse his own stepdaughter and stepson. He forced the children to engage in sexual activity with him

over a period of approximately four years. Then, as noted above, Hendricks was convicted of "taking indecent liberties" with two adolescent boys after he attempted to fondle them. As a result of that conviction, he was once again imprisoned, and was serving that sentence when he reached his conditional release date in September 1994.

Hendricks admitted that he had repeatedly abused children whenever he was not confined. He explained that when he "get[s] stressed out," he "can't control the urge" to molest children. *Id.*, at 172. Although Hendricks recognized that his behavior harms children, and he hoped he would not sexually molest children again, he stated that the only sure way he could keep from sexually abusing children in the future was "to die." *Id.*, at 190. Hendricks readily agreed with the state physician's diagnosis that he suffers from pedophilia and that he is not cured of the condition; indeed, he told the physician that "treatment is bull——." *Id.*, at 153, 190.[2]

The jury unanimously found beyond a reasonable doubt that Hendricks was a sexually violent predator. The trial court subsequently determined, as a matter of state law, that pedophilia qualifies as a "mental abnormality" as defined by

---

[2] In addition to Hendricks' own testimony, the jury heard from Hendricks' stepdaughter and stepson, who recounted the events surrounding their repeated sexual abuse at Hendricks' hands. App. 194–212. One of the girls to whom Hendricks exposed himself in 1955 testified as well. *Id.*, at 191–194. The State also presented testimony from Lester Lee, a licensed clinical social worker who specialized in treating male sexual offenders, and Dr. Charles Befort, the chief psychologist at Larned State Hospital. Lee testified that Hendricks had a diagnosis of personality trait disturbance, passive-aggressive personality, and pedophilia. *Id.*, at 219–220. Dr. Befort testified that Hendricks suffered from pedophilia and is likely to commit sexual offenses against children in the future if not confined. *Id.*, at 247–248. He further opined that pedophilia qualifies as a "mental abnormality" within the Act's definition of that term. *Id.*, at 263–264. Finally, Hendricks offered testimony from Dr. William S. Logan, a forensic psychiatrist, who stated that it was not possible to predict with any degree of accuracy the future dangerousness of a sex offender. *Id.*, at 328–331.

the Act, and thus ordered Hendricks committed to the Secretary's custody.

Hendricks appealed, claiming, among other things, that application of the Act to him violated the Federal Constitution's Due Process, Double Jeopardy, and *Ex Post Facto* Clauses. The Kansas Supreme Court accepted Hendricks' due process claim. 259 Kan., at 261, 912 P. 2d, at 138. The court declared that in order to commit a person involuntarily in a civil proceeding, a State is required by "substantive" due process to prove by clear and convincing evidence that the person is both (1) mentally ill, and (2) a danger to himself or to others. *Id.,* at 259, 912 P. 2d, at 137. The court then determined that the Act's definition of "mental abnormality" did not satisfy what it perceived to be this Court's "mental illness" requirement in the civil commitment context. As a result, the court held that "the Act violates Hendricks' substantive due process rights." *Id.,* at 261, 912 P. 2d, at 138.

The majority did not address Hendricks' *ex post facto* or double jeopardy claims. The dissent, however, considered each of Hendricks' constitutional arguments and rejected them. *Id.,* at 264–294, 912 P. 2d, 140–156 (Larson, J., dissenting).

## II

### A

Kansas argues that the Act's definition of "mental abnormality" satisfies "substantive" due process requirements. We agree. Although freedom from physical restraint "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," *Foucha* v. *Louisiana,* 504 U. S. 71, 80 (1992), that liberty interest is not absolute. The Court has recognized that an individual's constitutionally protected interest in avoiding physical restraint may be overridden even in the civil context:

> "[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not

import an absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members." *Jacobson* v. *Massachusetts*, 197 U. S. 11, 26 (1905).

Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. See, *e. g.*, 1788 N. Y. Laws, ch. 31 (Feb. 9, 1788) (permitting confinement of the "furiously mad"); see also A. Deutsch, The Mentally Ill in America (1949) (tracing history of civil commitment in the 18th and 19th centuries); G. Grob, Mental Institutions in America: Social Policy to 1875 (1973) (discussing colonial and early American civil commitment statutes). We have consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. See *Foucha, supra*, at 80; *Addington* v. *Texas*, 441 U. S. 418, 426–427 (1979). It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty. Cf. *id.*, at 426.

The challenged Act unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement. Commitment proceedings can be initiated only when a person "has been convicted of or charged with a sexually violent offense," and "suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence." Kan. Stat. Ann. § 59–29a02(a) (1994). The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not inca-

pacitated. As we have recognized, "[p]revious instances of violent behavior are an important indicator of future violent tendencies." *Heller* v. *Doe*, 509 U. S. 312, 323 (1993); see also *Schall* v. *Martin*, 467 U. S. 253, 278 (1984) (explaining that "from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct").

A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." See, *e. g., Heller, supra*, at 314–315 (Kentucky statute permitting commitment of "mentally retarded" or "mentally ill" and dangerous individual); *Allen* v. *Illinois*, 478 U. S. 364, 366 (1986) (Illinois statute permitting commitment of "mentally ill" and dangerous individual); *Minnesota ex rel. Pearson* v. *Probate Court of Ramsey Cty.*, 309 U. S. 270, 271–272 (1940) (Minnesota statute permitting commitment of dangerous individual with "psychopathic personality"). These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a "mental abnormality" or "personality disorder" that makes it difficult, if not impossible, for the person to control his dangerous behavior. Kan. Stat. Ann. § 59–29a02(b) (1994). The precommitment requirement of a "mental abnormality" or "personality disorder" is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.

Hendricks nonetheless argues that our earlier cases dictate a finding of "mental illness" as a prerequisite for civil commitment, citing *Foucha* and *Addington*. He then as-

serts that a "mental abnormality" is *not* equivalent to a "mental illness" because it is a term coined by the Kansas Legislature, rather than by the psychiatric community. Contrary to Hendricks' assertion, the term "mental illness" is devoid of any talismanic significance. Not only do "psychiatrists disagree widely and frequently on what constitutes mental illness," *Ake* v. *Oklahoma*, 470 U. S. 68, 81 (1985), but the Court itself has used a variety of expressions to describe the mental condition of those properly subject to civil confinement. See, *e. g.*, *Addington*, *supra*, at 425–426 (using the terms "emotionally disturbed" and "mentally ill"); *Jackson* v. *Indiana*, 406 U. S. 715, 732, 737 (1972) (using the terms "incompetency" and "insanity"); cf. *Foucha*, 504 U. S., at 88 (O'CONNOR, J., concurring in part and concurring in judgment) (acknowledging State's authority to commit a person when there is "some medical justification for doing so").

Indeed, we have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance. Cf. *Jones* v. *United States*, 463 U. S. 354, 365, n. 13 (1983). As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. The legal definitions of "insanity" and "competency," for example, vary substantially from their psychiatric counterparts. See, *e. g.*, Gerard, The Usefulness of the Medical Model to the Legal System, 39 Rutgers L. Rev. 377, 391–394 (1987) (discussing differing purposes of legal system and the medical profession in recognizing mental illness). Legal definitions, however, which must "take into account such issues as individual responsibility . . . and competency," need not mirror those advanced by the medical profession. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxiii, xxvii (4th ed. 1994).

To the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, the Kansas Act sets forth comparable criteria and Hendricks' condition doubtless satisfies those criteria. The mental health professionals who evaluated Hendricks diagnosed him as suffering from pedophilia, a condition the psychiatric profession itself classifies as a serious mental disorder. See, e. g., id., at 524–525, 527–528; 1 American Psychiatric Association, Treatments of Psychiatric Disorders 617–633 (1989); Abel & Rouleau, Male Sex Offenders, in Handbook of Outpatient Treatment of Adults 271 (M. Thase, B. Edelstein, & M. Hersen eds. 1990).[3] Hendricks even conceded that, when he becomes "stressed out," he cannot "control the urge" to molest children. App. 172. This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings. Hendricks' diagnosis as a pedophile, which qualifies as a "mental abnormality" under the Act, thus plainly suffices for due process purposes.

B

We granted Hendricks' cross-petition to determine whether the Act violates the Constitution's double jeopardy

---

[3] We recognize, of course, that psychiatric professionals are not in complete harmony in casting pedophilia, or paraphilias in general, as "mental illnesses." Compare Brief for American Psychiatric Association as Amicus Curiae 26 with Brief for Menninger Foundation et al. as Amici Curiae 22–25. These disagreements, however, do not tie the State's hands in setting the bounds of its civil commitment laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes. Cf. Jones v. United States, 463 U. S. 354, 365, n. 13 (1983). As we have explained regarding congressional enactments, when a legislature "undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." Id., at 370 (internal quotation marks and citation omitted).

prohibition or its ban on *ex post facto* lawmaking. The thrust of Hendricks' argument is that the Act establishes criminal proceedings; hence confinement under it necessarily constitutes punishment. He contends that where, as here, newly enacted "punishment" is predicated upon past conduct for which he has already been convicted and forced to serve a prison sentence, the Constitution's Double Jeopardy and *Ex Post Facto* Clauses are violated. We are unpersuaded by Hendricks' argument that Kansas has established criminal proceedings.

The categorization of a particular proceeding as civil or criminal "is first of all a question of statutory construction." *Allen,* 478 U. S., at 368. We must initially ascertain whether the legislature meant the statute to establish "civil" proceedings. If so, we ordinarily defer to the legislature's stated intent. Here, Kansas' objective to create a civil proceeding is evidenced by its placement of the Act within the Kansas probate code, Kan. Stat. Ann., Art. 29 (1994) ("Care and Treatment for Mentally Ill Persons"), instead of the criminal code, as well as its description of the Act as creating a *"civil commitment procedure,"* § 59–29a01 (emphasis added). Nothing on the face of the statute suggests that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm.

Although we recognize that a "civil label is not always dispositive," *Allen, supra,* at 369, we will reject the legislature's manifest intent only where a party challenging the statute provides "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil," *United States* v. *Ward,* 448 U. S. 242, 248–249 (1980). In those limited circumstances, we will consider the statute to have established criminal proceedings for constitutional purposes. Hendricks, however, has failed to satisfy this heavy burden.

As a threshold matter, commitment under the Act does not implicate either of the two primary objectives of criminal

punishment: retribution or deterrence. The Act's purpose is not retributive because it does not affix culpability for prior criminal conduct. Instead, such conduct is used solely for evidentiary purposes, either to demonstrate that a "mental abnormality" exists or to support a finding of future dangerousness. We have previously concluded that an Illinois statute was nonpunitive even though it was triggered by the commission of a sexual assault, explaining that evidence of the prior criminal conduct was "received not to punish past misdeeds, but primarily to show the accused's mental condition and to predict future behavior." *Allen, supra,* at 371. In addition, the Kansas Act does not make a criminal conviction a prerequisite for commitment—persons absolved of criminal responsibility may nonetheless be subject to confinement under the Act. See Kan. Stat. Ann. §59–29a03(a) (1994). An absence of the necessary criminal responsibility suggests that the State is not seeking retribution for a past misdeed. Thus, the fact that the Act may be "tied to criminal activity" is "insufficient to render the statut[e] punitive." *United States* v. *Ursery,* 518 U. S. 267 (1996).

Moreover, unlike a criminal statute, no finding of scienter is required to commit an individual who is found to be a sexually violent predator; instead, the commitment determination is made based on a "mental abnormality" or "personality disorder" rather than on one's criminal intent. The existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes. See *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 168 (1963). The absence of such a requirement here is evidence that confinement under the statute is not intended to be retributive.

Nor can it be said that the legislature intended the Act to function as a deterrent. Those persons committed under the Act are, by definition, suffering from a "mental abnormality" or a "personality disorder" that prevents them from exercising adequate control over their behavior. Such persons are therefore unlikely to be deterred by the threat of

confinement. And the conditions surrounding that confinement do not suggest a punitive purpose on the State's part. The State has represented that an individual confined under the Act is not subject to the more restrictive conditions placed on state prisoners, but instead experiences essentially the same conditions as any involuntarily committed patient in the state mental institution. App. 50–56, 59–60. Because none of the parties argues that people institutionalized under the Kansas general civil commitment statute are subject to punitive conditions, even though they may be involuntarily confined, it is difficult to conclude that persons confined under this Act are being "punished."

Although the civil commitment scheme at issue here does involve an affirmative restraint, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *United States* v. *Salerno,* 481 U. S. 739, 746 (1987). The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. Cf. *id.,* at 747. The Court has, in fact, cited the confinement of "mentally unstable individuals who present a danger to the public" as one classic example of nonpunitive detention. *Id.,* at 748–749. If detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held.

Hendricks focuses on his confinement's potentially indefinite duration as evidence of the State's punitive intent. That focus, however, is misplaced. Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. Cf. *Jones,* 463 U. S., at 368 (noting with approval that "because it is impossible to predict how long it will take for any given individual to recover [from insan-

ity]—or indeed whether he will ever recover—Congress has chosen . . . to leave the length of commitment indeterminate, subject to periodic review of the patient's suitability for release"). If, at any time, the confined person is adjudged "safe to be at large," he is statutorily entitled to immediate release. Kan. Stat. Ann. § 59–29a07 (1994).

Furthermore, commitment under the Act is only *potentially* indefinite. The maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year. § 59–29a08. If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement. *Ibid.* This requirement again demonstrates that Kansas does not intend an individual committed pursuant to the Act to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.

Hendricks next contends that the State's use of procedural safeguards traditionally found in criminal trials makes the proceedings here criminal rather than civil. In *Allen,* we confronted a similar argument. There, the petitioner "place[d] great reliance on the fact that proceedings under the Act are accompanied by procedural safeguards usually found in criminal trials" to argue that the proceedings were civil in name only. 478 U. S., at 371. We rejected that argument, however, explaining that the State's decision "to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions." *Id.,* at 372. The numerous procedural and evidentiary protections afforded here demonstrate that the Kansas Legislature has taken great care to confine only a narrow class of particularly dangerous individuals, and then only after meeting the strictest procedural standards. That Kansas chose to afford such procedural protections does not

transform a civil commitment proceeding into a criminal prosecution.

Finally, Hendricks argues that the Act is necessarily punitive because it fails to offer any legitimate "treatment." Without such treatment, Hendricks asserts, confinement under the Act amounts to little more than disguised punishment. Hendricks' argument assumes that treatment for his condition is available, but that the State has failed (or refused) to provide it. The Kansas Supreme Court, however, apparently rejected this assumption, explaining:

> "It is clear that the overriding concern of the legislature is to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best. The record reflects that treatment for sexually violent predators is all but nonexistent. The legislature concedes that sexually violent predators are not amenable to treatment under [the existing Kansas involuntary commitment statute]. If there is nothing to treat under [that statute], then there is no mental illness. In that light, the provisions of the Act for treatment appear somewhat disingenuous." 259 Kan., at 258, 912 P. 2d, at 136.

It is possible to read this passage as a determination that Hendricks' condition was *untreatable* under the existing Kansas civil commitment statute, and thus the Act's sole purpose was incapacitation. Absent a treatable mental illness, the Kansas court concluded, Hendricks could not be detained against his will.

Accepting the Kansas court's apparent determination that treatment is not possible for this category of individuals does not obligate us to adopt its legal conclusions. We have already observed that, under the appropriate circumstances and when accompanied by proper procedures, incapacitation

may be a legitimate end of the civil law. See *Allen, supra,* at 373; *Salerno,* 481 U. S., at 748–749. Accordingly, the Kansas court's determination that the Act's "overriding concern" was the continued "segregation of sexually violent offenders" is consistent with our conclusion that the Act establishes civil proceedings, 259 Kan., at 258, 912 P. 2d, at 136, especially when that concern is coupled with the State's ancillary goal of providing treatment to those offenders, if such is possible. While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, see *Allen, supra,* we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a "punitive" purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Accord, *Compagnie Francaise de Navigation a Vapeur* v. *Louisiana Bd. of Health,* 186 U. S. 380 (1902) (permitting involuntary quarantine of persons suffering from communicable diseases). Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions. Cf. *Greenwood* v. *United States,* 350 U. S. 366, 375 (1956) ("The fact that at present there may be little likelihood of recovery does not defeat federal power to make this initial commitment of the petitioner"); *O'Connor* v. *Donaldson,* 422 U. S. 563, 584 (1975) (Burger, C. J., concurring) ("[I]t remains a stubborn fact that there are many forms of mental illness which are not understood, some which are untreatable in the sense that no effective therapy has yet been discovered for them, and that rates of 'cure' are generally low").

Alternatively, the Kansas Supreme Court's opinion can be read to conclude that Hendricks' condition is treatable, but

that treatment was not the State's "overriding concern," and that no treatment was being provided (at least at the time Hendricks was committed). 259 Kan., at 258, 912 P. 2d, at 136. See also *ibid.* ("It is clear that the primary objective of the Act is to continue incarceration and not to provide treatment"). Even if we accept this determination that the provision of treatment was not the Kansas Legislature's "overriding" or "primary" purpose in passing the Act, this does not rule out the possibility that an ancillary purpose of the Act was to provide treatment, and it does not require us to conclude that the Act is punitive. Indeed, critical language in the Act itself demonstrates that the Secretary, under whose custody sexually violent predators are committed, has an obligation to provide treatment to individuals like Hendricks. § 59–29a07(a) ("If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the secretary of social and rehabilitation services for *control, care and treatment* until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large" (emphasis added)). Other of the Act's sections echo this obligation to provide treatment for committed persons. See, *e. g.,* § 59–29a01 (establishing civil commitment procedure "for the long-term care and treatment of the sexually violent predator"); § 59–29a09 (requiring the confinement to "conform to constitutional requirements for care and treatment"). Thus, as in *Allen,* "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery,' " 478 U. S., at 369 (quoting Ill. Rev. Stat., ch. 38, ¶ 105–8 (1985)), and we may therefore conclude that "the State has . . . provided for the treatment of those it commits," 478 U. S., at 370.

Although the treatment program initially offered Hendricks may have seemed somewhat meager, it must be remembered that he was the first person committed under the

Act. That the State did not have all of its treatment procedures in place is thus not surprising. What is significant, however, is that Hendricks was placed under the supervision of the Kansas Department of Health and Social and Rehabilitative Services, housed in a unit segregated from the general prison population and operated not by employees of the Department of Corrections, but by other trained individuals.[4] And, before this Court, Kansas declared "[a]bsolutely" that persons committed under the Act are now receiving in the neighborhood of "31-½ hours of treatment per week." Tr. of Oral Arg. 14–15, 16.[5]

Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing

---

[4] We have explained that the States enjoy wide latitude in developing treatment regimens. *Youngberg* v. *Romeo*, 457 U. S. 307, 317 (1982) (observing that the State "has considerable discretion in determining the nature and scope of its responsibilities"). In *Allen* v. *Illinois*, 478 U. S. 364 (1986), for example, we concluded that "the State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment." *Id.*, at 373 (emphasis deleted). By this measure, Kansas has doubtless satisfied its obligation to provide available treatment.

[5] Indeed, we have been informed that in an August 28, 1995, hearing on Hendricks' petition for state habeas corpus relief, the trial court, over admittedly conflicting testimony, ruled: "[T]he allegation that no treatment is being provided to any of the petitioners or other persons committed to the program designated as a sexual predator treatment program is not true. I find that they are receiving treatment." App. 453–454. Thus, to the extent that treatment is available for Hendricks' condition, the State now appears to be providing it. By furnishing such treatment, the Kansas Legislature has indicated that treatment, if possible, is at least an ancillary goal of the Act, which easily satisfies any test for determining that the Act is not punitive.

that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent. We therefore hold that the Act does not establish criminal proceedings and that involuntary confinement pursuant to the Act is not punitive. Our conclusion that the Act is nonpunitive thus removes an essential prerequisite for both Hendricks' double jeopardy and *ex post facto* claims.

1

The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." Although generally understood to preclude a second prosecution for the same offense, the Court has also interpreted this prohibition to prevent the State from "punishing twice, or attempting a second time to punish criminally, for the same offense." *Witte* v. *United States*, 515 U. S. 389, 396 (1995) (emphasis and internal quotation marks omitted). Hendricks argues that, as applied to him, the Act violates double jeopardy principles because his confinement under the Act, imposed after a conviction and a term of incarceration, amounted to both a second prosecution and a second punishment for the same offense. We disagree.

Because we have determined that the Kansas Act is civil in nature, initiation of its commitment proceedings does not constitute a second prosecution. Cf. *Jones* v. *United States*, 463 U. S. 354 (1983) (permitting involuntary civil commitment after verdict of not guilty by reason of insanity). Moreover, as commitment under the Act is not tantamount to "punishment," Hendricks' involuntary detention does not violate the Double Jeopardy Clause, even though that confinement may follow a prison term. Indeed, in *Baxstrom* v. *Herold*, 383 U. S. 107 (1966), we expressly recognized that civil commitment could follow the expiration of a prison term without offending double jeopardy principles. We reasoned that "there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal

term from all other civil commitments." *Id.*, at 111–112. If an individual otherwise meets the requirements for involuntary civil commitment, the State is under no obligation to release that individual simply because the detention would follow a period of incarceration.

Hendricks also argues that even if the Act survives the "multiple punishments" test, it nevertheless fails the "same elements" test of *Blockburger* v. *United States*, 284 U. S. 299 (1932). Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.*, at 304. The *Blockburger* test, however, simply does not apply outside of the successive prosecution context. A proceeding under the Act does not define an "offense," the elements of which can be compared to the elements of an offense for which the person may previously have been convicted. Nor does the Act make the commission of a specified "offense" the basis for invoking the commitment proceedings. Instead, it uses a prior conviction (or previously charged conduct) for evidentiary purposes to determine whether a person suffers from a "mental abnormality" or "personality disorder" and also poses a threat to the public. Accordingly, we are unpersuaded by Hendricks' novel application of the *Blockburger* test and conclude that the Act does not violate the Double Jeopardy Clause.

2

Hendricks' *ex post facto* claim is similarly flawed. The *Ex Post Facto* Clause, which " 'forbids the application of any new punitive measure to a crime already consummated,' " has been interpreted to pertain exclusively to penal statutes. *California Dept. of Corrections* v. *Morales*, 514 U. S. 499, 505 (1995) (quoting *Lindsey* v. *Washington*, 301 U. S. 397, 401 (1937)). As we have previously determined, the Act does not impose punishment; thus, its application does not raise

*ex post facto* concerns. Moreover, the Act clearly does not have retroactive effect. Rather, the Act permits involuntary confinement based upon a determination that the person *currently* both suffers from a "mental abnormality" or "personality disorder" and is likely to pose a future danger to the public. To the extent that past behavior is taken into account, it is used, as noted above, solely for evidentiary purposes. Because the Act does not criminalize conduct legal before its enactment, nor deprive Hendricks of any defense that was available to him at the time of his crimes, the Act does not violate the *Ex Post Facto* Clause.

## III

We hold that the Kansas Sexually Violent Predator Act comports with due process requirements and neither runs afoul of double jeopardy principles nor constitutes an exercise in impermissible *ex post facto* lawmaking. Accordingly, the judgment of the Kansas Supreme Court is reversed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I join the opinion of the Court in full and add these additional comments.

Though other issues were argued to us, as the action has matured it turns on whether the Kansas statute is an *ex post facto* law. A law enacted after commission of the offense and which punishes the offense by extending the term of confinement is a textbook example of an *ex post facto* law. If the object or purpose of the Kansas law had been to provide treatment but the treatment provisions were adopted as a sham or mere pretext, there would have been an indication of the forbidden purpose to punish. The Court's opinion gives a full and complete explanation why an *ex post facto* challenge based on this contention cannot succeed in the action before us. All this, however, concerns Hendricks alone. My brief, further comment is to caution against dangers in-

herent when a civil confinement law is used in conjunction with the criminal process, whether or not the law is given retroactive application.

It seems the dissent, too, would validate the Kansas statute as to persons who committed the crime after its enactment, and it might even validate the statute as to Hendricks, assuming a reasonable level of treatment. As all Members of the Court seem to agree, then, the power of the State to confine persons who, by reason of a mental disease or mental abnormality, constitute a real, continuing, and serious danger to society is well established. *Addington* v. *Texas*, 441 U. S. 418, 426–427 (1979). Confinement of such individuals is permitted even if it is pursuant to a statute enacted after the crime has been committed and the offender has begun serving, or has all but completed serving, a penal sentence, provided there is no object or purpose to punish. See *Baxstrom* v. *Herold*, 383 U. S. 107, 111–112 (1966). The Kansas law, with its attendant protections, including yearly review and review at any time at the instance of the person confined, is within this pattern and tradition of civil confinement. In this action, the mental abnormality—pedophilia—is at least described in the DSM–IV. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 524–525, 527–528 (4th ed. 1994).

Notwithstanding its civil attributes, the practical effect of the Kansas law may be to impose confinement for life. At this stage of medical knowledge, although future treatments cannot be predicted, psychiatrists or other professionals engaged in treating pedophilia may be reluctant to find measurable success in treatment even after a long period and may be unable to predict that no serious danger will come from release of the detainee.

A common response to this may be, "A life term is exactly what the sentence should have been anyway," or, in the words of a Kansas task force member, "SO BE IT." Testimony of Jim Blaufuss, App. 503. The point, however, is not

how long Hendricks and others like him should serve a criminal sentence. With his criminal record, after all, a life term may well have been the only sentence appropriate to protect society and vindicate the wrong. The concern instead is whether it is the criminal system or the civil system which should make the decision in the first place. If the civil system is used simply to impose punishment after the State makes an improvident plea bargain on the criminal side, then it is not performing its proper function. These concerns persist whether the civil confinement statute is put on the books before or after the offense. We should bear in mind that while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.

On the record before us, the Kansas civil statute conforms to our precedents. If, however, civil confinement were to become a mechanism for retribution or general deterrence, or if it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it.

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE SOUTER join, and with whom JUSTICE GINSBURG joins as to Parts II and III, dissenting.

I agree with the majority that the Kansas Sexually Violent Predator Act's "definition of 'mental abnormality'" satisfies the "substantive" requirements of the Due Process Clause. *Ante,* at 356. Kansas, however, concedes that Hendricks' condition is treatable; yet the Act did not provide Hendricks (or others like him) with any treatment until after his release date from prison and only inadequate treatment thereafter. These, and certain other, special features of the Act convince me that it was not simply an effort to commit Hendricks civilly, but rather an effort to inflict further punishment upon him. The *Ex Post Facto* Clause therefore pro-

hibits the Act's application to Hendricks, who committed his crimes prior to its enactment.

I

I begin with the area of agreement. This Court has held that the civil commitment of a "mentally ill" and "dangerous" person does not automatically violate the Due Process Clause provided that the commitment takes place pursuant to proper procedures and evidentiary standards. See *Foucha* v. *Louisiana*, 504 U. S. 71, 80 (1992); *Addington* v. *Texas*, 441 U. S. 418, 426–427 (1979). The Kansas Supreme Court, however, held that the Due Process Clause forbids application of the Act to Hendricks for "substantive" reasons, *i. e.*, irrespective of the procedures or evidentiary standards used. The court reasoned that Kansas had not satisfied the "mentally ill" requirement of the Due Process Clause because Hendricks was not "mentally ill." *In re Hendricks*, 259 Kan. 246, 260–261, 912 P. 2d 129, 137–138 (1996). Moreover, Kansas had not satisfied what the court believed was an additional "substantive due process" requirement, namely, the provision of treatment. *Id.*, at 257–258, 912 P. 2d, at 136. I shall consider each of these matters briefly.

A

In my view, the Due Process Clause permits Kansas to classify Hendricks as a mentally ill and dangerous person for civil commitment purposes. *Allen* v. *Illinois*, 478 U. S. 364, 370–371, 373–375 (1986). I agree with the majority that the Constitution gives States a degree of leeway in making this kind of determination. *Ante*, at 359; *Foucha*, *supra*, at 87 (O'CONNOR, J., concurring in part and concurring in judgment); *Jones* v. *United States*, 463 U. S. 354, 365, n. 13 (1983). But, because I do not subscribe to all of its reasoning, I shall set forth three sets of circumstances that, taken together, convince me that Kansas has acted within the limits that the Due Process Clause substantively sets.

First, the psychiatric profession itself classifies the kind of problem from which Hendricks suffers as a serious mental disorder. *E. g.,* American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders 524–525, 527–528 (4th ed. 1994) (describing range of paraphilias and discussing how stress aggravates pedophilic behavior); Abel & Rouleau, Male Sex Offenders, in Handbook of Outpatient Treatment of Adults 271 (M. Thase, B. Edelstein, & M. Hersen eds. 1990). I concede that professionals also debate whether or not this disorder should be called a mental "illness." See R. Slovenko, Psychiatry and Criminal Culpability 57 (1995) (citing testimony that paraphilias are not mental illnesses); Schopp & Sturgis, Sexual Predators and Legal Mental Illness for Civil Commitment, 13 Behav. Sci. & The Law 437, 451–452 (1995) (same). Compare Brief for American Psychiatric Association as *Amicus Curiae* 26 (mental illness requirement not satisfied) with Brief for Menninger Clinic et al. as *Amici Curiae* 22–25 (requirement is satisfied). But the very presence and vigor of this debate is important. The Constitution permits a State to follow one reasonable professional view, while rejecting another. See *Addington* v. *Texas, supra,* at 431. The psychiatric debate, therefore, helps to inform the law by setting the bounds of what is reasonable, but it cannot here decide just how States must write their laws within those bounds. See *Jones, supra,* at 365, n. 13.

Second, Hendricks' abnormality does not consist simply of a long course of antisocial behavior, but rather it includes a specific, serious, and highly unusual inability to control his actions. (For example, Hendricks testified that, when he gets "stressed out," he cannot "control the urge" to molest children, see *ante,* at 355.) The law traditionally has considered this kind of abnormality akin to insanity for purposes of confinement. See, *e. g., Minnesota ex rel. Pearson* v. *Probate Court of Ramsey Cty.,* 309 U. S. 270, 274 (1940) (upholding against a due process challenge the civil confinement of

a dangerous person where the danger flowed from an "'utter lack of power to control . . . sexual impulses'") (quoting *State ex rel. Pearson* v. *Probate Court of Ramsey Cty.*, 205 Minn. 545, 555, 287 N. W. 297, 302 (1939)); 1788 N. Y. Laws, ch. 31 (permitting confinement of those who are "furiously mad"); *In re Oakes,* 8 Law Rep. 122, 125 (Mass. 1845) (Shaw, C. J.); A. Deutsch, The Mentally Ill in America 419–420 (1949) (tracing history of commitment of furiously mad people in 18th and 19th centuries); Dershowitz, The Origins of Preventative Confinement in Anglo-American Law—Part II: The American Experience, 43 U. Cin. L. Rev. 781 (1974). Indeed, the notion of an "irresistible impulse" often has helped to shape criminal law's insanity defense and to inform the related recommendations of legal experts as they seek to translate the insights of mental health professionals into workable legal rules. See also American Law Institute, Model Penal Code § 4.01 (insanity defense, in part, rests on inability "to conform . . . conduct to the requirements of law"); A. Goldstein, The Insanity Defense 67–79 (1967) (describing "irresistible impulse" test).

Third, Hendricks' mental abnormality also makes him dangerous. Hendricks "has been convicted of . . . a sexually violent offense," and a jury found that he "suffers from a mental abnormality . . . which makes" him "likely to engage" in similar "acts of sexual violence" in the future. Kan. Stat. Ann. §§ 59–29a02, 59–29a03 (1994). The evidence at trial favored the State. Dr. Befort, for example, explained why Hendricks was likely to commit further acts of sexual violence if released. See, *e. g.,* App. 248–254. And Hendricks' own testimony about what happens when he gets "stressed out" confirmed Dr. Befort's diagnosis.

Because (1) many mental health professionals consider pedophilia a serious mental disorder; and (2) Hendricks suffers from a classic case of irresistible impulse, namely, he is so afflicted with pedophilia that he cannot "control the urge" to molest children; and (3) his pedophilia presents a serious

danger to those children, I believe that Kansas can classify Hendricks as "mentally ill" and "dangerous" as this Court used those terms in *Foucha*.

The Kansas Supreme Court's contrary conclusion rested primarily upon that court's view that Hendricks would not qualify for civil commitment under Kansas' own state civil commitment statute. The issue before us, however, is one of constitutional interpretation. The Constitution does not require Kansas to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals. Moreover, Hendricks apparently falls outside the scope of the Kansas general civil commitment statute because that statute permits confinement only of those who "lac[k] capacity to make an informed decision concerning treatment." Kan. Stat. Ann. § 59–2902(h) (1994). The statute does not tell us why it imposes this requirement. Capacity to make an informed decision about treatment is not always or obviously incompatible with severe mental illness. Neither Hendricks nor his *amici* point to a uniform body of professional opinion that says as much, and we have not found any. See, *e. g.*, American Psychiatric Assn., Guidelines for Legislation on the Psychiatric Hospitalization of Adults, 140 Am. J. Psychiatry 672, 673 (1983); Stromberg & Stone, A Model State Law on Civil Commitment of the Mentally Ill, 20 Harv. J. Legis. 275, 301–302 (1983); DeLand & Borenstein, Medicine Court, II, *Rivers* in Practice, 147 Am. J. Psychiatry 38 (1990). Consequently, the boundaries of the Federal Constitution and those of Kansas' general civil commitment statute are not congruent.

### B

The Kansas Supreme Court also held that the Due Process Clause requires a State to provide treatment to those whom it civilly confines (as "mentally ill" and "dangerous"). It found that Kansas did not provide Hendricks with significant

treatment. And it concluded that Hendricks' confinement violated the Due Process Clause for this reason as well.

This case does not require us to consider whether the Due Process Clause *always* requires treatment—whether, for example, it would forbid civil confinement of an *untreatable* mentally ill, dangerous person. To the contrary, Kansas argues that pedophilia is an "abnormality" or "illness" that can be treated. See Tr. of Oral Arg. 12 (Kansas Attorney General, in response to the question "you're claiming that there is some treatability . . . ?" answering "[a]bsolutely"); Brief for Petitioner 42–47. Two groups of mental health professionals agree. Brief for Association for the Treatment of Sexual Abusers as *Amicus Curiae* 11–12 (stating that "sex offenders can be treated" and that "increasing evidence" shows that "state-of-the-art treatment programs . . . significantly reduce recidivism"); Brief for Menninger Foundation et al. as *Amici Curiae* 28. Indeed, no one argues the contrary. Hence the legal question before us is whether the Clause forbids Hendricks' confinement unless Kansas provides him with treatment *that it concedes is available.*

Nor does anyone argue that Kansas somehow could have violated the Due Process Clause's *treatment* concerns had it provided Hendricks with the treatment that is potentially available (and I do not see how any such argument could succeed). Rather, the basic substantive due process treatment question is whether that Clause requires Kansas to provide treatment that it concedes is potentially available to a person whom it concedes is treatable. This same question is at the heart of my discussion of whether Hendricks' confinement violates the Constitution's *Ex Post Facto* Clause. See *infra*, at 383–395. For that reason, I shall not consider the substantive due process treatment question separately, but instead shall simply turn to the *Ex Post Facto* Clause discussion. As JUSTICE KENNEDY points out, *ante*, p. 371, some of the matters there discussed may later prove relevant to substantive due process analysis.

## II

Kansas' 1994 Act violates the Federal Constitution's prohibition of "any . . . *ex post facto* Law" if it "inflicts" upon Hendricks "a greater punishment" than did the law "annexed to" his "crime[s]" when he "committed" those crimes in 1984. *Calder* v. *Bull,* 3 Dall. 386, 390 (1798) (opinion of Chase, J.); U. S. Const., Art. I, § 10. The majority agrees that the Clause " 'forbids the application of any *new punitive measure* to a crime already consummated.' " *California Dept. of Corrections* v. *Morales,* 514 U. S. 499, 505 (1995) (citation omitted; emphasis added). *Ante,* at 370–371. But it finds the Act is not "punitive." With respect to that basic question, I disagree with the majority.

Certain resemblances between the Act's "civil commitment" and traditional criminal punishments are obvious. Like criminal imprisonment, the Act's civil commitment amounts to "secure" confinement, Kan. Stat. Ann. § 59–29a07(a) (1994), and "incarceration against one's will," *In re Gault,* 387 U. S. 1, 50 (1967). See Testimony of Terry Davis, SRS Director of Quality Assurance, App. 52–54, 78–81 (confinement takes place in the psychiatric wing of a prison hospital where those whom the Act confines and ordinary prisoners are treated alike). Cf. *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257, 298 (1989) (O'CONNOR, J., concurring in part and dissenting in part). In addition, a basic objective of the Act is incapacitation, which, as Blackstone said in describing an objective of criminal law, is to "depriv[e] the party injuring of the power to do future mischief." 4 W. Blackstone, Commentaries *11–*12 (incapacitation is one important purpose of criminal punishment); see also *Foucha,* 504 U. S., at 99 (KENNEDY, J., dissenting) ("Incapacitation for the protection of society is not an unusual ground for incarceration"); *United States* v. *Brown,* 381 U. S. 437, 458 (1965) ("Punishment serves several purposes: retributive, rehabilitative, deterrent—and preventative. One of the reasons society imprisons those convicted

of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment"); 1 W. LaFave & A. Scott, Substantive Criminal Law § 1.5, p. 32 (1986); 18 U. S. C. § 3553(a); United States Sentencing Guidelines, Guidelines Manual, ch. 1, pt. A (Nov. 1995).

Moreover, the Act, like criminal punishment, imposes its confinement (or sanction) only upon an individual who has previously committed a criminal offense. Kan. Stat. Ann. §§ 59–29a02(a), 59–29a03(a) (1994). Cf. *Department of Revenue of Mont.* v. *Kurth Ranch,* 511 U. S. 767, 781 (1994) (fact that a tax on marijuana was "conditioned on the commission of a crime" is "'significant of [its] penal and prohibitory intent'" (citation omitted)); *Lipke* v. *Lederer,* 259 U. S. 557, 561–562 (1922). And the Act imposes that confinement through the use of persons (county prosecutors), procedural guarantees (trial by jury, assistance of counsel, psychiatric evaluations), and standards ("beyond a reasonable doubt") traditionally associated with the criminal law. Kan. Stat. Ann. §§ 59–29a06, 59–29a07 (1994).

These obvious resemblances by themselves, however, are not legally sufficient to transform what the Act calls "civil commitment" into a criminal punishment. Civil commitment of dangerous, mentally ill individuals by its very nature involves confinement and incapacitation. Yet "civil commitment," from a constitutional perspective, nonetheless remains civil. *Allen* v. *Illinois,* 478 U. S., at 369–370. Nor does the fact that criminal behavior triggers the Act make the critical difference. The Act's insistence upon a prior crime, by screening out those whose past behavior does not concretely demonstrate the existence of a mental problem or potential future danger, may serve an important noncriminal evidentiary purpose. Neither is the presence of criminal law-type procedures determinative. Those procedures can serve an important purpose that in this context one might consider noncriminal, namely, helping to prevent judgmental

mistakes that would wrongly deprive a person of important liberty. *Id.*, at 371–372.

If these obvious similarities cannot by themselves prove that Kansas' "civil commitment" statute is criminal, neither can the word "civil" written into the statute, § 59–29a01, by itself prove the contrary. This Court has said that only the "clearest proof" could establish that a law the legislature called "civil" was, in reality, a "punitive" measure. *United States* v. *Ward*, 448 U. S. 242, 248–249 (1980). But the Court has also reiterated that a "civil label is not always dispositive," *Allen* v. *Illinois, supra*, at 369; it has said that in close cases the label is "'not of paramount importance,'" *Kurth Ranch, supra*, at 777 (citation omitted); and it has looked behind a "civil" label fairly often, *e. g., United States* v. *Halper*, 490 U. S. 435, 447 (1989).

In this circumstance, with important features of the Act pointing in opposite directions, I would place particular importance upon those features that would likely distinguish between a basically punitive and a basically nonpunitive purpose. *United States* v. *Ursery*, 518 U. S. 267, 278 (1996) (asking whether a statutory scheme was so punitive "'either in purpose or effect'" to negate the legislature's "'intention to establish a civil remedial mechanism'" (citations omitted)). And I note that the Court, in an earlier civil commitment case, *Allen* v. *Illinois*, 478 U. S., at 369, looked primarily to the law's concern for treatment as an important distinguishing feature. I do not believe that *Allen* means that a particular law's lack of concern for treatment, by itself, is enough to make an incapacitative law punitive. But, for reasons I will point out, when a State believes that treatment does exist, and then couples that admission with a legislatively required delay of such treatment until a person is at the end of his jail term (so that further incapacitation is therefore necessary), such a legislative scheme begins to look punitive.

In *Allen*, the Court considered whether, for Fifth Amendment purposes, proceedings under an Illinois statute were

civil or "criminal." The Illinois statute, rather like the Kansas statute here, authorized the confinement of persons who were sexually dangerous, who had committed at least one prior sexual assault, and who suffered from a "mental disorder." *Id.*, at 366, n. 1. The *Allen* Court, looking behind the statute's "civil commitment" label, found the statute civil—in important part because the State had "provided for the treatment of those it commits." *Id.*, at 370 (also referring to facts that the State had "disavowed any interest in punishment" and that it had "established a system under which committed persons may be released after the briefest time in confinement").

In reaching this conclusion, the Court noted that the State Supreme Court had found the proceedings "'essentially civil'" because the statute's aim was to provide "'treatment, not punishment.'" *Id.*, at 367 (quoting *People* v. *Allen,* 107 Ill. 2d 91, 99–101, 481 N. E. 2d 690, 694–695 (1985)). It observed that the State had "a statutory obligation to provide 'care and treatment . . . designed to effect recovery'" in a "facility set aside to provide psychiatric care." 478 U. S., at 369 (quoting Ill. Rev. Stat., ch. 38, ¶ 105–8 (1985)). And it referred to the State's purpose as one of *"treating* rather than punishing sexually dangerous persons." 478 U. S., at 373; see also *ibid.* ("Had petitioner shown, for example, that the confinement . . . imposes . . . a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case").

The *Allen* Court's focus upon treatment, as a kind of touchstone helping to distinguish civil from punitive purposes, is not surprising, for one would expect a nonpunitive statutory scheme to confine, not simply in order to protect, but also in order to cure. That is to say, one would expect a nonpunitively motivated legislature that confines *because of* a dangerous mental abnormality to seek to help the individual himself overcome that abnormality (at least insofar as professional treatment for the abnormality exists and is

potentially helpful, as Kansas, supported by some groups of mental health professionals, argues is the case here, see *supra*, at 378).  Conversely, a statutory scheme that provides confinement that does not reasonably fit a practically available, medically oriented treatment objective, more likely reflects a primarily punitive legislative purpose.

Several important treatment-related factors—factors of a kind that led the five-Member *Allen* majority to conclude that the Illinois Legislature's purpose was primarily civil, not punitive—in this action suggest precisely the opposite. First, the State Supreme Court here, unlike the state court in *Allen*, has held that treatment is not a significant objective of the Act.  The Kansas court wrote that the Act's purpose is "segregation of sexually violent offenders," with "treatment" a matter that was "incidental at best."  259 Kan., at 258, 912 P. 2d, at 136.  By way of contrast, in *Allen* the Illinois court had written that "'treatment, not punishment,'" was "the aim of the statute." *Allen, supra*, at 367 (quoting *People* v. *Allen, supra*, at 99–101, 481 N. E. 2d, at 694–695).

We have generally given considerable weight to the findings of state and lower federal courts regarding the intent or purpose underlying state officials' actions, see *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 829 (1995) (ordinarily "[w]e must . . . accept the state court's view of the purpose of its own law"); *Romer* v. *Evans*, 517 U. S. 620, 626 (1996); *Hernandez* v. *New York*, 500 U. S. 352, 366–370 (1991) (plurality opinion); *id.*, at 372 (O'CONNOR, J., concurring); *Edwards* v. *Aguillard*, 482 U. S. 578, 594, n. 15 (1987); but see *Department of Revenue of Mont.* v. *Kurth Ranch*, 511 U. S., at 776, 780, n. 18; *Stone* v. *Graham*, 449 U. S. 39, 40–43 (1980) *(per curiam); Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 530, 533, 535–537 (1980), although the level of deference given to such findings varies with the circumstances, *Crawford* v. *Board of Ed. of Los Angeles*, 458 U. S. 527, 544, n. 30 (1982), and is not always as conclusive as a state court's construction of one of its stat-

utes, see, *e. g., R. A. V. v. St. Paul,* 505 U. S. 377, 381 (1992). For example, *Allen*'s dissenters, as well as its majority, considered the state court's characterization of the state law's purpose an important factor in determining the constitutionality of that statute. *Allen,* 478 U. S., at 380 (STEVENS, J., dissenting) (describing the state court as "the final authority on the . . . purpose" of the statute).

The record provides support for the Kansas court's conclusion. The court found that, as of the time of Hendricks' commitment, the State had not funded treatment, it had not entered into treatment contracts, and it had little, if any, qualified treatment staff. See 259 Kan., at 249, 258, 912 P. 2d, at 131, 136; Testimony of Dr. Charles Befort, App. 255 (acknowledging that he has no specialized training); Testimony of John House, SRS Attorney, *id.,* at 367 (no contract has been signed by bidders); Testimony of John House, SRS Attorney, *id.,* at 369 (no one hired to operate sexually violent predator (SVP) program or to serve as clinical director, psychiatrist, or psychologist). Indeed, were we to follow the majority's invitation to look beyond the record in this case, an invitation with which we disagree, see *infra,* at 391–393, it would reveal that Hendricks, according to the commitment program's own director, was receiving "essentially no treatment." Dr. Charles Befort in State Habeas Corpus Proceeding, App. 393; 259 Kan., at 249, 258, 912 P. 2d, at 131, 136. See also App. 421 ("[T]he treatment that is prescribed by statute" is "still not available"); *id.,* at 420–421 (the "needed treatment" "hasn't been delivered yet" and "Hendricks has wasted ten months" in "terms of treatment effects"); *id.,* at 391–392 (Dr. Befort admitting that he is not qualified to be SVP program director).

It is therefore not surprising that some of the Act's official supporters had seen in it an opportunity permanently to confine dangerous sex offenders, *e. g., id.,* at 468 (statement of Attorney General Robert Stephan); *id.,* at 475–476, 478 (statement of Special Assistant to the Attorney General

Carla Stovall). Others thought that effective treatment did not exist, *id.*, at 503 (statement of Jim Blaufuss) ("Because there is no effective treatment for sex offenders, this Bill may mean a life sentence for a felon that is considered a risk to women and children. SO BE IT!")—a view, by the way, that the State of Kansas, supported by groups of informed mental health professionals, here strongly denies. See *supra,* at 378.

The Kansas court acknowledged the existence of "provisions of the Act for treatment" (although it called them "somewhat disingenuous"). 259 Kan., at 258, 912 P. 2d, at 136. Cf. Kan. Stat. Ann. § 59–29a01 (1994) (legislative findings that "prognosis for rehabilita[tion] . . . in a prison setting is poor, . . . treatment needs . . . long term" and "commitment procedure for . . . long term care and treatment . . . necessary"); § 59–29a09 ("commitment . . . shall conform to constitutional requirements for care and treatment"). Nor did the court deny that Kansas could later increase the amount of treatment it provided. But the Kansas Supreme Court could, and did, use the Act's language, history, and initial implementation to help it characterize the Act's primary purposes.

Second, the Kansas statute, insofar as it applies to previously convicted offenders such as Hendricks, commits, confines, and treats those offenders *after* they have served virtually their entire criminal sentence. That time-related circumstance seems deliberate. The Act explicitly defers diagnosis, evaluation, and commitment proceedings until a few weeks prior to the "anticipated release" of a previously convicted offender from prison. Kan. Stat. Ann. § 59–29a03(a)(1) (1994). But why, one might ask, does the Act not commit and require treatment of sex offenders sooner, say, soon after they begin to serve their sentences?

An Act that simply seeks confinement, of course, would not need to begin civil commitment proceedings sooner. Such an Act would have to begin proceedings only when an

offender's prison term ends, threatening his release from the confinement that imprisonment assures. But it is difficult to see why rational legislators who seek treatment would write the Act in this way—providing treatment years after the criminal act that indicated its necessity. See, e. g., Wettstein, A Psychiatric Perspective on Washington's Sexually Violent Predators Statute, 15 U. Puget Sound L. Rev. 597, 617 (1992) (stating that treatment delay leads to "loss of memory" and makes it "more difficult for the offender" to "accept responsibility," and that time in prison leads to attitude hardening that "engender[s] a distorted view of the precipitating offense"). And it is particularly difficult to see why legislators who specifically wrote into the statute a finding that "prognosis for rehabilitating . . . in a prison setting is poor" would leave an offender in that setting for months or years before beginning treatment. This is to say, the timing provisions of the statute confirm the Kansas Supreme Court's view that treatment was not a particularly important legislative objective.

I recognize one possible counterargument. A State, wanting both to punish Hendricks (say, for deterrence purposes) and also to treat him, might argue that it should be permitted to postpone treatment until after punishment in order to make certain that the punishment in fact occurs. But any such reasoning is out of place here. Much of the treatment that Kansas offered here (called "ward milieu" and "group therapy") can be given at the same time as, and in the same place where, Hendricks serves his punishment. See, e. g., Testimony of Leroy Hendricks, App. 142–143, 150, 154, 179–181 (stating that Washington and Kansas had both provided group therapy to Hendricks, and that he had both taken and refused such treatment at various points); Testimony of Terry Davis, SRS Director of Quality Assurance, id., at 78–81 (pointing out that treatment under the Act takes place in surroundings very similar to those in which prisoners receive treatment); Testimony of John House, SRS

Attorney, *id.*, at 375–376. See also Task Force on Community Protection, Final Report to Booth Gardner, Governor State of Washington II-2 (1989) (findings of task force that developed the Washington State Act, which served as a model for Kansas' Act, stating that "[s]ex offenders can be treated during incarceration"). The evidence adduced at the state habeas proceeding, were we to assume it properly before the Court, see *infra*, at 392–393, supports this conclusion as well. See Testimony of Dr. Befort at State Habeas Proceeding, App. 399, 406–408 (describing treatment as ward milieu and group therapy); *id.*, at 416–417 (stating that Kansas offers similar treatment, on a voluntary basis, to prisoners). Hence, assuming, *arguendo*, that it would be otherwise permissible, Kansas need not postpone treatment in order to make certain that sex offenders serve their full terms of imprisonment, *i. e.*, to make certain that they receive the entire punishment that Kansas criminal law provides. To the contrary, the statement in the Act itself, that the Act aims to respond to special "long term" "treatment needs," suggests that treatment should begin during imprisonment. It also suggests that, were those long-term treatment needs (rather than further punishment) Kansas' primary aim, the State would require that treatment begin soon after conviction, not 10 or more years later. See also Vt. Stat. Ann., Tit. 18, § 2815 (1959) (providing for treatment of sexual psychopaths first, and punishment afterwards).

Third, the statute, at least as of the time Kansas applied it to Hendricks, did not require the committing authority to consider the possibility of using less restrictive alternatives, such as postrelease supervision, halfway houses, or other methods that *amici* supporting Kansas here have mentioned. Brief for Menninger Foundation et al. as *Amici Curiae* 28; Brief for Association for the Treatment of Sexual Abusers as *Amicus Curiae* 11–12. The laws of many other States require such consideration. See Appendix, *infra*.

This Court has said that a failure to consider, or to use, "alternative and less harsh methods" to achieve a nonpunitive objective can help to show that legislature's "purpose . . . was to punish." *Bell* v. *Wolfish*, 441 U. S. 520, 539, n. 20 (1979). And one can draw a similar conclusion here. Legislation that seeks to help the individual offender as well as to protect the public would avoid significantly greater restriction of an individual's liberty than public safety requires. See Keilitz, Conn, & Gianpetro, Least Restrictive Treatment of Involuntary Patients: Translating Concepts into Practice, 29 St. Louis U. L. J. 691, 693 (1985) (describing "least restrictive alternativ[e]" provisions in the ordinary civil commitment laws of almost all States); Lyon, Levine, & Zusman, Patients' Bill of Rights: A Survey of State Statutes, 6 Mental Disability L. Rep. 178, 181–183 (1982) (same). Legislation that seeks almost exclusively to incapacitate the individual through confinement, however, would not necessarily concern itself with potentially less restrictive forms of incapacitation. I would reemphasize that this is not a case in which the State claims there is no treatment potentially available. Rather, Kansas, and supporting *amici*, argue that pedophilia is treatable. See *supra*, at 378.

Fourth, the laws of other States confirm, through comparison, that Kansas' "civil commitment" objectives do not require the statutory features that indicate a punitive purpose. I have found 17 States with laws that seek to protect the public from mentally abnormal, sexually dangerous individuals through civil commitment or other mandatory treatment programs. Ten of those statutes, unlike the Kansas statute, begin treatment of an offender soon after he has been apprehended and charged with a serious sex offense. Only seven, like Kansas, delay "civil" commitment (and treatment) until the offender has served his criminal sentence (and this figure includes the Acts of Minnesota and New Jersey, both of which generally do not delay treatment). Of these seven, however, six (unlike Kansas) require consideration of less re-

strictive alternatives. See Ariz. Rev. Stat. Ann. §§ 13–4601, 4606B (Supp. 1996–1997); Cal. Welf. & Inst. Code Ann. §§ 6607, 6608 (West Supp. 1997); Minn. Stat. § 253B.09 (1996); N. J. Stat. Ann. § 30:4–27.11d (West 1997); Wash. Rev. Code Ann. § 71.09.090 (Supp. 1996–1997); Wis. Stat. § 980.06(2)(b) (Supp. 1993–1994). Only one State other than Kansas, namely Iowa, both delays civil commitment (and consequent treatment) and does not explicitly consider less restrictive alternatives. But the law of that State applies prospectively only, thereby avoiding *ex post facto* problems. See Iowa Code Ann. § 709C.12 (Supp. 1997) (Iowa SVP Act only "applies to persons convicted of a sexually violent offense on or after July 1, 1997"); see also Appendix, *infra*. Thus the practical experience of other States, as revealed by their statutes, confirms what the Kansas Supreme Court's finding, the timing of the civil commitment proceeding, and the failure to consider less restrictive alternatives, themselves suggest, namely, that for *Ex Post Facto* Clause purposes, the purpose of the Kansas Act (as applied to previously convicted offenders) has a punitive, rather than a purely civil, purpose.

Kansas points to several cases as support for a contrary conclusion. It points to *Allen*—which is, as we have seen, a case in which the Court concluded that Illinois' "civil commitment" proceedings were not criminal. I have explained in detail, however, how the statute here differs from that in *Allen,* and why *Allen's* reasoning leads to a different conclusion in this litigation. See *supra,* at 381–388 and this page.

Kansas also points to *Addington* v. *Texas,* where the Court held that the Constitution does not require application of criminal law's "beyond a reasonable doubt" standard in a civil commitment proceeding. 441 U. S., at 428. If some criminal law guarantees such as "reasonable doubt" did not apply in *Addington,* should other guarantees, such as the prohibition against *ex post facto* laws, apply here? The answer to this question, of course, lies in the particular statute at issue in *Addington*—a Texas statute that, this Court ob-

served, did "not exercis[e]" state power "in a punitive sense." *Ibid.* That statute did not add civil commitment's confinement to imprisonment; rather civil commitment was, at most, a substitute for criminal punishment. See Tex. Rev. Civ. Stat. Ann. § 5547–41 (Vernon 1958) (petition must state "proposed patient is not charged with a crime or [is] charged [but] transferred . . . for civil commitment proceedings"). And this Court, relying on the Texas Supreme Court's interpretation, wrote that the "State of Texas confines only for the purpose of providing care designed to treat the individual." *Addington, supra,* at 428, n. 4 (citing *State* v. *Turner,* 556 S. W. 2d 563, 566 (1977)). Cf. *Specht* v. *Patterson,* 386 U. S. 605, 608–609 (1967) (separate postconviction sexual psychopath commitment/sentencing proceeding held after conviction for serious sex crime, imposes a "criminal punishment even though . . . designed not so much as retribution as . . . to keep individuals from inflicting future harm"). Nothing I say here would change the reach or holding of *Addington* in any way. That is, a State is free to commit those who are dangerous and mentally ill in order to treat them. Nor does my decision preclude a State from deciding that a certain subset of people are mentally ill, dangerous, and untreatable, and that confinement of this subset is therefore necessary (again, assuming that all the procedural safeguards of *Addington* are in place). But when a State decides offenders can be treated and confines an offender to provide that treatment, but then refuses to provide it, the refusal to treat while a person is fully incapacitated begins to look punitive.

The majority suggests that this is the very case I say it is not, namely, a case of a mentally ill person who is *untreatable.* *Ante,* at 365. And it quotes a long excerpt from the Kansas Supreme Court's opinion in support. That court, however, did not find that Hendricks was untreat*able;* it found that he was untreat*ed*—quite a different matter. Had the Kansas Supreme Court thought that Hendricks, or oth-

ers like him, are untreatable, it could not have written the words that follow that excerpt, adopting by reference the words of another court opinion:

> " 'The statute forecloses the possibility that offenders will be evaluated and treated until after they have been punished. . . . Setting aside the question of whether a prison term exacerbates or minimizes the mental condition of a sex offender, it plainly delays the treatment that must constitutionally accompany commitment pursuant to the Statute. The failure of the Statute to provide for examination or treatment prior to the completion of the punishment phase strongly suggests that treatment is of secondary, rather than primary, concern.' " ˙ 259 Kan., at 258, 912 P. 2d, at 136 (quoting *Young v. Weston,* 898 F. Supp. 744, 753 (WD Wash. 1995)).

This quotation, and the rest of the opinion, make clear that the court is finding it objectionable that the statute, among other things, has not provided adequate treatment to one who, all parties here concede, *can* be treated.

The majority suggests in the alternative that recent evidence shows that Kansas is now providing treatment. *Ante,* at 366–368. That evidence comes from two sources: First, a statement by the Kansas Attorney General at oral argument that those committed under the Act are now receiving treatment, *ante,* at 368; and second, in a footnote, a Kansas trial judge's statement, in a state habeas proceeding nearly one year after Hendricks was committed, that Kansas is providing treatment. *Ante,* at 368, n. 5. I do not see how either of these statements can be used to justify the validity of the Act's application to Hendricks at the time he filed suit.

We are reviewing the Kansas Supreme Court's determination of Hendricks' case. Neither the majority nor the lengthy dissent in that court referred to the two facts that the majority now seizes upon, and for good reason. That court denied a motion to take judicial notice of the state

habeas proceeding, see Order of Kansas Supreme Court, No. 94–73039, Mar. 1, 1996. The proceeding is thus not part of the record, and cannot properly be considered by this Court. And the Kansas Supreme Court obviously had no chance to consider Kansas' new claim made at oral argument before this Court. There is simply no evidence in the record before this Court that comes even close to resembling the assertion Kansas made at oral argument. It is the record, not the parties' view of it, that must control our decision. See *Russell* v. *Southard*, 12 How. 139, 158–159 (1851); *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157–158, n. 16 (1970); *Hopt* v. *Utah*, 114 U. S. 488, 491–492 (1885); *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 489, n. 3 (1986); *New Haven Inclusion Cases*, 399 U. S. 392, 450, n. 66 (1970); R. Stern, E. Gressman, S. Shapiro, & K. Geller, Supreme Court Practice 555–556, 594 (7th ed. 1993); Fed. Rule Evid. 201(b).

The prohibition on facts found outside the record is designed to ensure the reliability of the evidence before the Court. For purposes of my argument in this dissent, however, the material that the majority wishes to consider, when read in its entirety, shows that Kansas was *not* providing treatment to Hendricks. At best, the testimony at the state hearing contained general and vague references that treatment was about to be provided, but it contains *no statement* that Hendricks *himself* was receiving treatment. And it provides the majority with no support at all in respect to that key fact. Indeed, it demonstrates the contrary conclusion. For example, the program's director, Dr. Befort, testified that he would have to tell the court at Hendricks' next annual review, in October 1995, that Hendricks "has had no opportunity for meaningful treatment." App. 400. He also stated that SVP's were receiving "essentially no treatment" and that the program does not "have adequate staffing." *Id.*, at 393, 394. And Dr. Befort's last words made clear that Hendricks has "wasted ten months . . . in terms of treatment

effects" and that, as far as treatment goes, "[t]oday, it's still not available." *Id.*, at 420–421. Nor does the assertion made by the Kansas Attorney General at oral argument help the majority. She never stated that *Hendricks*, as opposed to other SVP's, was receiving this treatment. And we can find no support for her statement in the record.

We have found no other evidence in the record to support the conclusion that Kansas was in fact providing the treatment that all parties agree that it could provide. Thus, even had the Kansas Supreme Court considered the majority's new evidence—which it did not—it is not likely to have changed its characterization of the Act's treatment provisions as "somewhat disingenuous." 259 Kan., at 258, 912 P. 2d, at 136.

Regardless, the Kansas Supreme Court did so characterize the Act's treatment provisions and did find that treatment was "at best" an "incidental" objective. Thus, the circumstances here are different from *Allen*, where the Illinois Supreme Court explicitly found that the statute's aim was to provide treatment, not punishment. See *supra*, at 382–384. There is no evidence in the record that contradicts the finding of the Kansas court. Thus, *Allen*'s approach—its reliance on the state court—if followed here would mean the Act as applied to *Leroy Hendricks* (as opposed to others who may have received treatment or who were sentenced after the effective date of the Act) is punitive.

Finally, Kansas points to *United States* v. *Salerno*, 481 U. S. 739 (1987), a case in which this Court held preventive detention of a dangerous accused person pending trial constitutionally permissible. *Salerno*, however, involved the brief detention of that person, after a finding of "probable cause" that he had committed a crime that would justify further imprisonment, and only pending a speedy judicial determination of guilt or innocence. This Court, in *Foucha*, emphasized the fact that the confinement at issue in *Salerno* was "strictly limited in duration." 504 U. S., at 82. It described

that "pretrial detention of arrestees" as "one of those carefully limited exceptions permitted by the Due Process Clause." *Id.*, at 83. And it held that *Salerno* did not authorize the indefinite detention, on grounds of dangerousness, of "insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others." 504 U. S., at 83. Whatever *Salerno*'s "due process" implications may be, it does not focus upon, nor control, the question at issue here, the question of "punishment" for purposes of the *Ex Post Facto* Clause.

One other case warrants mention. In *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144 (1963), this Court listed seven factors that helped it determine whether a particular statute was primarily punitive for purposes of applying the Fifth and Sixth Amendments. Those factors include whether a sanction involves an affirmative restraint, how history has regarded it, whether it applies to behavior already a crime, the need for a finding of scienter, its relationship to a traditional aim of punishment, the presence of a nonpunitive alternative purpose, and whether it is excessive in relation to that purpose. *Id.*, at 169. This Court has said that these seven factors are "neither exhaustive nor dispositive," but nonetheless "helpful." *Ward*, 448 U. S., at 249. Paraphrasing them here, I believe the Act before us involves an affirmative restraint historically regarded as punishment; imposed upon behavior already a crime after a finding of scienter; which restraint, namely, confinement, serves a traditional aim of punishment, does not primarily serve an alternative purpose (such as treatment), and is excessive in relation to any alternative purpose assigned. 372 U. S., at 168–169.

This is not to say that each of the factors the Court mentioned in *Martinez-Mendoza* on balance argues here in favor of a constitutional characterization as "punishment." It is not to say that I have found "a single 'formula' for identifying those legislative changes that have a sufficient effect on

substantive crimes or punishments to fall within the constitutional prohibition," *Morales*, 514 U. S., at 509; see also *Halper*, 490 U. S., at 447; *id.*, at 453 (KENNEDY, J., concurring). We have not previously done so, and I do not do so here. Rather, I have pointed to those features of the Act itself, in the context of this litigation, that lead me to conclude, in light of our precedent, that the added confinement the Act imposes upon Hendricks is basically punitive. This analysis, rooted in the facts surrounding Kansas' failure to treat Hendricks, cannot answer the question whether the Kansas Act, as it now stands, and in light of its current implementation, is punitive toward people other than he. And I do not attempt to do so here.

III

To find that the confinement the Act imposes upon Hendricks is "punishment" is to find a violation of the *Ex Post Facto* Clause. Kansas does not deny that the 1994 Act changed the legal consequences that attached to Hendricks' earlier crimes, and in a way that significantly "disadvantage[d] the offender," *Weaver* v. *Graham*, 450 U. S. 24, 29 (1981). See Brief for Respondent State of Kansas 37–39.

To find a violation of that Clause here, however, is not to hold that the Clause prevents Kansas, or other States, from enacting dangerous sexual offender statutes. A statute that operates prospectively, for example, does not offend the *Ex Post Facto* Clause. *Weaver*, 450 U. S., at 29. Neither does it offend the *Ex Post Facto* Clause for a State to sentence offenders to the fully authorized sentence, to seek consecutive, rather than concurrent, sentences, or to invoke recidivism statutes to lengthen imprisonment. Moreover, a statute that operates retroactively, like Kansas' statute, nonetheless does not offend the Clause *if the confinement that it imposes is not punishment*—if, that is to say, the legislature does not simply add a later criminal punishment to an earlier one. *Ibid.*

The statutory provisions before us do amount to punishment primarily because, as I have said, the legislature did not tailor the statute to fit the nonpunitive civil aim of treatment, which it concedes exists in Hendricks' case. The Clause in these circumstances does not stand as an obstacle to achieving important protections for the public's safety; rather it provides an assurance that, where so significant a restriction of an individual's basic freedoms is at issue, a State cannot cut corners. Rather, the legislature must hew to the Constitution's liberty-protecting line. See The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton).

I therefore would affirm the judgment below.

## APPENDIX TO OPINION OF BREYER, J.

SELECTED SEXUAL OFFENSE COMMITMENT STATUTES
(Kansas is the only State that answers "yes"
to all three categories)

| State | Delays Treatment | Fails to Consider Less Restrictive Alternatives | Applies to Pre-Act Crimes |
|---|---|---|---|
| Ariz. Rev. Stat. Ann. § 13–4601 *et seq.* (Supp. 1996–1997) | Yes | No | * |
| Cal. Welf. & Inst. Code Ann. § 6600 *et seq.* (West Supp. 1997) | Yes | No | Yes |
| Colo. Rev. Stat. § 16–11.7–101 *et seq.* (Supp. 1996) | No | Yes | Some-times |
| Conn. Gen. Stat. § 17a–566 *et seq.* (1992 and Supp. 1996) | No | * | * |
| Ill. Comp. Stat., ch. 725, § 205 *et seq.* (1994) | No | No | |
| Iowa Code Ann. ch. 709C (Supp. 1996) | Yes | Yes | No |
| Kan. Stat. Ann. § 59–29a01 *et seq.* (1994) | Yes | Yes | Yes |
| Mass. Gen. Laws, ch. 123A (Supp. 1997) | No | * | * |
| Minn. Stat. Ann., ch. 253B (1994 and Supp. 1996–1997) | Some-times | No | Yes |

### SELECTED SEXUAL OFFENSE COMMITMENT STATUTES—Continued

| State | Delays Treatment | Fails to Consider Less Restrictive Alternatives | Applies to Pre-Act Crimes |
|---|---|---|---|
| Neb. Rev. Stat. § 29–2923 et seq. (Supp. 1996) | No | No | Generally not |
| N. J. Stat. Ann. § 30:4–82.4 et seq. (West 1997) | Some-times | No | * |
| N. M. Stat. Ann. § 43–1–1 et seq. (1993) | No | No | * |
| Ore. Rev. Stat. § 426.510 et seq. (1995) | No | Yes | Generally not |
| Tenn. Code Ann. § 33–6–301 et seq. (1984 and Supp. 1996) | No | Yes | * |
| Utah Code Ann. § 77–16–1 et seq. (1995) | No | Yes | Generally not |
| Wash. Rev. Code Ann. § 71.09.01 et seq. (1992 and Supp. 1996–1997) | Yes | No | Yes |
| Wis. Stat. § 980.010 et seq. (Supp. 1993–1994) | Yes | No | Yes |

(* = designation that the statute does not specify)