Richard G. TURAY, Plaintiff,

v.

Mark SELING, Ph.D., et al., Defendants.

Jerry R. Sharp, et al., Plaintiffs,

v.

David B. Weston, et al., Defendants.

Randy Pedersen, et al., Plaintiffs,

v.

Tim Hill, et al., Defendants.

John F. Hall, et al., Plaintiffs,

v.

Lyle Quasim, et al., Defendants.

Ronald Petersen, et al., Plaintiffs,

v.

William Dehmer, et al., Defendants.

Nos. C91–664WD, C94–121WD, C94–211WD, C95–1111WD, C96–415WD.

United States District Court, W.D. Washington, at Seattle.

May 5, 2000.

Karen F Jones, Riddell Williams P.S., Seattle, WA, for Richard Garrett Turay.

Richard Garrett Turay, SCC, Steilacoom, WA, pro se.

Judith M. Mandel, John L Cross, Port Orchard, WA, Mary Opgenorth, Dept of Assigned Counsel, Lakewood, WA, for Laura McCollum.

Terrance James Ryan, Sarah Jane Coats, Joann L. Pheasant, Attorney General's Office, Social & Health Services, Olympia, WA, Janet Leigh Capps, Attorney General's Office, Tort Claims Division, Seattle, WA, Gregory P. Canova, Attorney General's Office, Criminal Justice Division, Seattle, WA, for John Taylor–Anderson, Norm Nelson, William Dehmer, Joan Kirchoff.

Sarah Jane Coats, Joann L. Pheasant, Attorney General's Office, Social & Health Services, Olympia, WA, Janet Leigh Capps, Attorney General's Office, Tort Claims Division, Seattle, WA, for Karen

Sullivan, Scott Neil, Pete Hazel, Richard Bosse, Steve Wahl, Andre Simon.

Sarah Jane Coats, Joann L. Pheasant, Attorney General's Office, Social & Health Services, Olympia, WA, for Mark Seling.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER RE MOTIONS HEARD APRIL 18–21, 2000

DWYER, District Judge.

### I. INTRODUCTION

These cases, consolidated for purposes of injunctive relief, involve conditions of confinement at the Special Commitment Center ("SCC") at McNeil Island, Washington. The plaintiffs are SCC residents civilly committed for an indefinite time as "sexually violent predators"; the defendants are the institution's superintendent and acting clinical director. On November 15, 1999, following an evidentiary hearing held in October, the court held the defendants in contempt of court for having failed to take all reasonable steps within their power to comply with the 1994 injunction herein by making constitutionally adequate mental health treatment available to residents of the SCC. As a sanction defendants were ordered to pay into the registry of the court $50 per day per resident, which amount would be due for each day commencing May 1, 2000, unless the court sooner determined that injunction compliance was complete or substantially complete (Dkt. # 1249 in *Turay* ). A minute order entered on April 24, 2000, changed the May 1 date to May 8, 2000 (Dkt.# 1312). Defendants were thus given six additional months after the October hearing, and five months after the contempt order was entered, to comply before the sanction took effect. The contempt order set a further hearing as to injunction compliance for April 18, 2000. That hearing took place as scheduled for four days, April 18–21, 2000, and was attended by counsel and, in part, by some of the resident-plaintiffs. At the hearing the court granted the pro se plaintiffs' unopposed motion to admit into evidence certain declarations and attached exhibits they had filed before the hearing, with leave to all parties to call any one or more of the declarants for live examination. The parties then presented opening statements to supplement their pre-hearing briefs and that of the amici curiae. The special master, whose seventeenth report (Dkt.# 1302) was received in evidence without objection as Exhibit A–1, testified as a witness called by the court, and was cross-examined by the parties. Plaintiffs then presented their evidence, consisting of live testimony subject to cross-examination, and exhibits, and rested. Defendants then presented their evidence, also consisting of live testimony and exhibits, and rested. Pursuant to court order the parties thereafter submitted proposed findings of fact and conclusions of law. The testimony and declarations and exhibits received in evidence, and the parties' briefs and arguments, have been fully considered. This order constitutes the court's findings of fact and conclusions of law, and its ruling on plaintiffs' motion for the imposition of sanctions for contempt and defendants' motion to dissolve the injunction.

### II. THE CONSTITUTIONAL REQUIREMENT AND THE CENTRAL ISSUE

The applicable legal rules have been set out in earlier orders, but for ease of reference will be summarized again.

RCW ch. 71.09, the Washington law establishing the SCC, is a civil commitment statute. A sex offender, typically one who has served or is about to complete his prison term, may be detained and committed under it for an indefinite time. The term "sexually violent predator" is defined as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(1). If a

committed person petitions for discharge from confinement, the main question is whether his mental abnormality or personality disorder has so changed that he is no longer likely to engage in predatory acts of sexual violence. *See* RCW 71.09.090.

■ The Fourteenth Amendment Due Process Clause of the United States Constitution requires state officials to provide civilly-committed persons, such as these plaintiffs, with access to mental health treatment that gives them a realistic opportunity to be cured or to improve the mental condition for which they were confined. *See Youngberg v. Romeo*, 457 U.S. 307, 319–22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Ohlinger v. Watson*, 652 F.2d 775, 778 (9th Cir.1980). This rule applies to sex offenders, and "[l]ack of funds, staff or facilities cannot justify the State's failure to provide [those confined] with that treatment necessary for rehabilitation." *Ohlinger v. Watson*, 652 F.2d at 778–79. The *Youngberg* constitutional standard "determines whether a particular decision has substantially met professionally accepted minimum standards." *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2nd Cir.1984).

Accordingly, these plaintiffs, and others involuntarily confined through civil proceedings, cannot simply be warehoused and put out of sight; they must be afforded adequate treatment. Although confined, they are not prisoners. They are entitled by law to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322, 102 S.Ct. 2452. Recognizing these requirements, the Washington statute provides that "[a]ny person committed pursuant to this chapter has the right to adequate care and individualized treatment." RCW 71.09.080(2).

■ As to the nature of the treatment, the State "enjoy[s] wide latitude in devel-oping treatment regimens [for sex offenders]," *Kansas v. Hendricks*, 521 U.S. 346, 368 n. 4, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), and "liability [on a claim of constitutional deprivation] may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323, 102 S.Ct. 2452. The *Hendricks* Court rejected a facial challenge to a Kansas statute modeled on Washington's, noting that by committing sex offenders "to an institution expressly designed to provide psychiatric care and treatment" the state "has doubtless satisfied its obligation to provide available treatment." 521 U.S. at 368 n. 4, 117 S.Ct. 2072.

Whether to adopt a civil commitment statute of this nature is, of course, optional with each state. A 1998 survey showed that eighteen states had such statutes while thirty-two did not. *See* Kimberly A. Dorsett, *Kansas v. Hendricks: Marking the Beginning of a Dangerous New Era in Civil Commitment*, 48 DePaul L.Rev. 113, 114 ns. 10 & 11 (1998). Most states still rely on other methods, such as treatment in prison followed by supervised release, to avoid repeat offenses.

The central issue in the present cases is whether the defendants are providing constitutionally adequate mental health treatment to the plaintiff SCC residents as required by due process and the Supreme Court decisions cited above. The finding that SCC has failed to provide such treatment in the past has been made not just by the jury and district judge in the present cases, but also by the State of Washington's Inspection of Care ("IOC") Report issued in October 1999, by the Superior Court of the State of Washington for King County[1], by the special master herein, by

---

1. In Cause No. 93–2–09933–9 the Superior Court of the State of Washington for King

County found on November 15, 1994, that SCC was depriving a resident of due process

other experts including one called by defendants at an earlier hearing, and even by the SCC's recently-departed clinical director and current superintendent.

It is important to note that certain issues are *not* before the court. Whether the statute is constitutional has been answered by the Supreme Court's decision in *Hendricks*. Commitment orders are entered by the state courts, not the federal court, and no question is raised herein as to the validity of any resident's commitment. Whether better and more economical ways exist to prevent sex offenders from re-offending is for the public and the state legislature, not the courts, to decide.

### III. SUMMARY OF THIS AND OTHER SCC–RELATED LITIGATION

The history of these cases is thoroughly set out in the orders entered on November 25 and December 23, 1998 (Dkt. ## 1026 and 1067 in *Turay* ). In brief, the departures from professionally accepted minimum standards at the SCC have been so substantial "as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323, 102 S.Ct. 2452. Following a 1994 jury verdict adverse in part to defendants in the *Turay* case, and findings made by the court, the defendants were enjoined on June 3, 1994, to take certain steps to make constitutionally adequate mental health treatment available at the SCC. When progress was slow, a special master—Dr. Janice K. Marques, who had been nominated by defendants—was appointed to assist defendants in achieving

compliance and to submit reports to the court. Dr. Marques has now submitted seventeen reports. The court has monitored injunction compliance and has held several hearings on plaintiffs' motions for a finding of contempt and defendants' motions for release from the injunction. On each occasion the court has found areas of improvement but a continuing failure to meet minimum professional standards. The findings have concerned the staffing, staff training, treatment plans and programs, and treatment environment at the SCC.

The *Sharp* cases (No. C94–121WD and later cases consolidated with it) were commenced by other SCC residents seeking damages and injunctive relief relating to their conditions of confinement. The damages claims of the plaintiffs (Rolando Aguilar, Joseph Aqui, Curtis Beard, Paul Begay, Elmer Campbell, Samuel Donaghe, Anthony Gallegos, John Hall, Herman Paschke, Randy Pedersen, Ronald Petersen, Joel Reimer, Jerry Sharp, Gilberto Soliz, and Richard Turay) were settled in mediation in 1998, defendants agreeing to pay $150,000 ($10,000 per claimant) plus $250,000 in attorneys' fees.

By agreement of the parties and pursuant to Fed.R.Civ.P. 42(a), the claims for injunctive relief in *Sharp* (as defined in the settlement agreement), and the injunction compliance issues in *Turay* (plaintiffs' renewed motion for contempt and defendants' motion for release from the injunction), were tried together in an evidentiary hearing held on October 6–9, 1998. On the basis of the evidence received at that hearing, the court on November 25, 1998, en-

---

by failing to afford constitutionally adequate treatment, citing "(1) [l]ack of sufficient staff trained, experienced and certified in treatment of sex offenders[;] (2)[l]ack of a comprehensive treatment program which includes timely deviancy evaluations, highly structured treatment manuals, adequate scheduling of pre-group, core group, and psycho-educational modules, significant employment opportunities within the facility, involvement of family members in treatment, and a conditional release and aftercare program[;] (3)[l]ack of

individual treatment plans which include objective benchmarks of improvement so as to document, measure and grade an individual's progress in therapy[;] and (4)[l]ack of training and supervision of staff, resulting in verbal abuse of residents, lack of trust and rapport with residents and staff, and a milieu counterproductive to treatment." *See also* Dkt. # 130 in *Sharp*. These findings were adopted by stipulation as the law of the case in *Sharp*. Dkt. # 537, p. 3.

tered findings and conclusions determining that constitutionally-required standards for affording mental health treatment to persons involuntarily committed in civil proceedings were still unmet. The shortfalls, and the steps necessary to remedy them, were specifically set out in the order (Dkt.# 1026).

An order of December 23, 1998, amended the November 25 order in two respects and denied a stay of the injunction pending defendants' appeal to the Ninth Circuit (Dkt.# 1067).

A further hearing on injunction compliance was held in open court on May 18, 1999.[2] The court again found that progress had been made but that the SCC still failed to meet constitutional and professional minimum standards and that the defendants had not yet complied, or substantially complied, with the injunction. The defendants were enjoined to complete the steps required by the order of November 25, 1998, as amended by the order of December 23, 1998; the special master's fifteenth report dated May 6, 1999, was adopted as a statement of work remaining to be done. Plaintiffs' renewed motion for contempt, and defendants' renewed motion for dissolution of the injunction, were denied. A further evidentiary hearing was scheduled for October 19, 1999, to be preceded by a further report by the special master. *See* May 27, 1999 order (Dkt.# 1139).

As scheduled, a three-day evidentiary hearing on injunction compliance was held on October 19–21, 1999. At the hearing, defendants did not contend that injunction compliance had been achieved, and did not seek dissolution of the injunction. Instead, they recognized through the testimony of managerial employees, and through counsel, that minimum professional standards for treating sex offenders were not yet fully met and that the goal of providing constitutionally adequate mental health treatment was still unattained. That concession was inevitable in view of the IOC Report, issued pursuant to Washington law on October 4, 1999, which essentially concurred with the findings of this court and the special master.

On November 15, 1999, the court found by clear and convincing evidence that although certain improvements had been made (largely in a flurry of activity before the hearing), the continuing "failures to comply with the injunction ... are failures to meet constitutionally required minimum professional standards for the treatment of sex offenders"; that the record showed "footdragging which has continued for an unconscionable time"; that defendants "persistently have failed to make constitutionally adequate mental health treatment available to the SCC residents, and have departed so substantially from professional minimum standards as to demonstrate that their decisions and practices were not and are not based on their professional judgment"; that defendants "have failed to take all reasonable steps within their power to comply or substantially comply with the injunction, and have intentionally disregarded the injunction's requirements"; and that defendants accordingly were in contempt of court.[3] (Dkt. # 1249 at 15–20.)

---

**2.** Fed.R.Civ.P. 62(c) provides that "[w]hen an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal on such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." A contempt finding may be made, and sanctions imposed, while an appeal from an injunction is pending. *See, e.g., Vac–Air Inc. v. John Mohr & Sons, Inc.,*

54 F.R.D. 580, 580–81 (E.D.Wis.1972) (citing *Howat v. Kansas,* 258 U.S. 181, 189–190, 42 S.Ct. 277, 66 L.Ed. 550 (1922)).

**3.** As noted in the November 15, 1999, findings, the defendants' failures to comply with the injunction do not represent the personal choice of Drs. Seling and Gollogly, the SCC's superintendent and acting clinical director, but must be attributed to them as the named defendants.

The importance of injunction compliance is underscored by two Washington Supreme Court decisions filed on October 21, 1999, *In re Turay*, 139 Wash.2d 379, 986 P.2d 790 (1999), *petition for cert. filed*, No. 99–1548 (Mar. 21, 2000), and *In re Campbell*, 139 Wash.2d 341, 986 P.2d 771 (1999), *petition for cert. filed*, No. 99–8629 (Mar. 13, 2000). The state supreme court in those cases declined by 6–2 votes to order two SCC residents released, holding that their remedies of injunctive relief and damages were sufficient and citing the present injunction as demonstrating that constitutionally adequate mental health treatment can be provided. The federal injunction, the state court held, gives residents "an adequate remedy that will guarantee that the conditions at the SCC will meet or exceed constitutional standards." *Turay*, 139 Wash.2d at 420, 986 P.2d 790. *See also Campbell*, 139 Wash.2d at 350, 986 P.2d 771 ("Remediation is already ongoing under the direction of the federal district court.").

Also of importance is *Young v. Weston*, 192 F.3d 870 (9th Cir.1999), in which the Ninth Circuit, reviewing a decision by Chief Judge Coughenour of this district, held that while RCW ch. 71.09 is constitutional on its face, conditions of confinement at the SCC could render it punitive as applied, in which event the ex post facto and double jeopardy clauses could be violated. The Supreme Court granted certiorari in *Young* on March 20, 2000. *Seling v. Young*, —— U.S. ——, 120 S.Ct. 1416, 146 L.Ed.2d 309. The issue in the present cases—whether mental health treatment is being afforded as required by the due process clause—is distinct from the question whether the conditions of confinement are punitive for purposes of ex post facto and double jeopardy analysis, and the Ninth Circuit's decision in *Young* is not applicable here.

## IV. FINDINGS OF FACT

Based upon the evidence received at the April 18–21, 2000, hearing, the court now finds that the following facts have been proved by clear and convincing evidence:

1. Since the contempt order was entered on November 15, 1999, the defendants have made a genuine and sustained effort to bring the SCC program into compliance with the injunction. As stated by the special master in her seventeenth report at page 2:

It should be noted at this introductory point that the work period covered in this report (November 1999—March 2000) was an exceptional one for the SCC program. Following the October hearing and subsequent (November 15, 1999) Court order, DSHS management declared that they would make every effort not only to bring SCC into compliance with the injunction, but to build a model civil commitment program. Ongoing management consultation was provided in order to develop an extensive "Injunction Response Report," a comprehensive and well-organized presentation of the program's goals, objectives, action plans, and achievements. Substantial resources were made available to expand SCC's management team, increase clinical and residential staffing, improve the facility and conditions, and provide the Superintendent and Clinical Director with the expertise and personnel needed to accomplish the program improvements required by the Court. Consultants and new staff were brought in to address specific program needs such as training, treatment planning, adaptation of the curriculum for individuals with special needs, policy review, and development of a strategic plan for SCC.

2. There is no doubt that this effort was caused by the contempt order. In fact, both sides have proposed findings saying that it was. At all previous stages, the state agencies moved slowly, and often reluctantly, to make improvements. Faced with a sanction, they have moved with speed and determination.

3. The chief cause of non-compliance, as found in the November 15, 1999 order,

has been the State's failure to provide needed resources. The past few months have seen significant changes for the better. Since the November order, the State has provided an additional $3 million for staff hiring and training and the legislature has budgeted $14 million for the first stage of a new facility to be built on McNeil Island outside the McNeil Island Corrections Center ("MICC") perimeter. The rate of progress at SCC has been greatly improved by these additional resources; continued adequate funding will be vital to establishing and maintaining a constitutionally adequate program.

4. Although conditions at SCC are far better than they were when the injunction was issued in 1994, all parties recognize that injunction compliance is not yet complete. The court also finds that it is not yet substantially complete, although it is approaching that point.

5. The statement contained in Court's Exhibit I, prepared by Dr. Marques for the Association for the Treatment of Sexual Abusers, correctly and without dispute by any party summarizes the applicable professional standards. Court's Exhibit 1 is essentially the same as the professional standards summarized in Finding of Fact 4, pages 11–12, in the order of November 25, 1998. Its text is reproduced as Appendix A to these findings.

6. The special master's seventeenth report correctly lists the work remaining to be done to comply with the injunction. Dr. Seling testified that he accepts the report in that regard. The court also adopts the factual findings set forth in that report.

7. The shortcomings that remain do not reflect the judgment of any qualified professional; they exist, and have existed, despite uncontradicted professional opinion that they are failures to provide, in certain respects, what the minimum professional standards require.

8. The position of permanent clinical director, vacated when Dr. Robert Smith resigned in 1999, is still vacant and, despite diligent recruiting efforts, has proved hard to fill. Dr. Vincent Gollogly has served as acting clinical director for several months. According to the evidence he has done an excellent job. The possibility, described by Dr. Seling in answer to a question by the court, that Dr. Gollogly could continue in office with the aid of expert consultants while he gains more credentials, should be considered.

9. The evidence establishes the following in regard to the steps required by the November 25, 1998, order as amended by the December 23, 1998, order (the amendments are noted in brackets). As noted in the order of November 15, 1999, each of these steps corresponds to an item in the original 1994 injunction. The summary given below does not replace the more detailed statements in the special master's seventeenth report.

(a) To carry out additional staff training at the SCC, with new residential care staff to finish the orientation training before beginning work on the unit, residential care and clinical staff to complete mental health training within four months of commencing their employment, and advanced training on the treatment of sexual deviance to be provided.

*Accomplished since the contempt order was entered:* Thirty new staff positions were created in December 1999, improving the staff-to-resident population ratio. Defendants have implemented a comprehensive training plan, including documentation of the times for completion of staff training. The turnover rate among staff has been reduced. Residential staff have been trained to understand the SCC's clinical mission, although some have yet to absorb the message.

*Still to be done:* More training is needed to strengthen communication and teamwork between clinical and residential staff, to eliminate confusion as to staff roles, to assure that residential staff act consistently with SCC's clinical mission, and to en-

hance the treatment ability of all staff including those who treat residents with special needs.

(b) To provide a coherent and individualized treatment program for each resident complete with understandable progress goals and a road map showing the way to improvement and release, such plan to include the components recognized as necessary for maximum treatment potential.

*Accomplished since the contempt order was entered:* Individualized treatment plans for all residents have been developed. These follow a standard format and are approved by the acting clinical director. Records of resident participation and progress during each trimester are kept, which provide feedback on performance and specify goals that must be achieved for advancement to the next treatment phase.

*Still to be done:* Treatment plans must be improved to address medical and psychiatric concerns as to some residents. Individualized treatment plans are needed for those residents with special needs. Professional judgment should be exercised in deciding whether, and to what extent, to recognize progress made by residents in prior treatment programs. Arrangements must be made for the community transition of qualified residents, under supervision, when they are ready for a less restrictive alternative ("LRA"). This phase is required by statute (*see* RCW 71.09), and confirmed by all experts on both sides as a vital part of the professional minimum standards. Without LRAs, the constitutional requirement of treatment leading, if successful, to cure and release, cannot fully be met. This area is described by the special master as "the most important piece of unfinished business in the SCC program." Seventeenth report at 19. Although a community transition manager has been hired and potential LRA sites have been visited, there is still no systematic transition program or off-island facility. As a result, transfers to an LRA have

been delayed in at least a few instances, according to Dr. Seling's testimony. The SCC plans to transfer two or three residents to off-island facilities in the near future, but the ad hoc negotiations for their placement are no substitute for a systematic transition program with adequate LRA facilities. Defendants must move decisively, and with adequate funding, to establish LRAs for qualified residents.

(c) To make adequate provision for participation by residents' families in rehabilitation efforts, including setting aside a room for visits by family members, permitting family visits with reasonable frequency, and allowing prompt telephone access to residents in cases of family emergency, consistent with security.

*Accomplished since the contempt order was entered:* Defendants have installed a telephone system that allows outgoing calls; assigned a social worker to the living unit for the purpose, among others, of increasing family outreach; refrained from discouraging family support; and held social events for residents and family visitors two or three times per year.

*Still to be done:* Defendants still have not brought family members sufficiently into the treatment process, and some family members have never been contacted by SCC or informed of opportunities for family counseling. At times the institution has failed to respond to family members' inquiries or requests to visit. Defendants must take all reasonable steps to provide this universally-recognized element of treatment.

(d) Pending the construction of a separate treatment-oriented facility, to reduce the negative effects of the current connection with MICC by taking the following steps:

(i) Eliminate the routine strip searches of SCC residents following every visit [time for compliance extended to January 22, 1999];

(ii) Eliminate the monitoring of residents' telephone calls and the bar on outgoing calls (other than collect);

(iii) Negotiate with MICC management to obtain better meal and activity schedules, and to eliminate harassment of residents by prisoners; and

(iv) [Negotiate to] acquire more adequate space within the MICC complex, e.g., by taking over all of A Unit when new space is needed, with yard space adjacent thereto.

*Accomplished since the contempt order was entered:* The state legislature has budgeted $14 million for the first phase of a new SCC facility to be built outside the MICC perimeter on McNeil Island. Negotiations with MICC management have resulted in limited access to the "big yard" and elimination of the F Unit for segregation. SCC and MICC have entered a memorandum of understanding for SCC's takeover of the lower level of B Unit in early 2001 to accommodate additional residents until the new facility is ready. Nurses and a crash cart are stationed on the unit, and pay telephones have been installed. A planning document, showing each step from now until the new facility is constructed, including population estimates, data on space per resident, an end date for temporary overcrowding, and a proposal for separating groups, has been prepared.

*Still to be done:* MICC's negative effects on the SCC, which have been caused partly by Department of Corrections ("DOC") resistance to the SCC's needs, continue to exist in some respects, and must be further reduced. For example, DOC-ordered closures of the corridor between A Unit and the locations where SCC residents attend classes have disrupted treatment, and DOC officers have dealt with resident misbehavior which should be handled by SCC personnel.

(e) To improve the treatment environment in the following respects:

(i) Use new living space to provide some separation between residents in treatment and those who have harassed treatment recipients;

(ii) Draft and implement fair and reasonable grievance procedures and behavior management plans; and

(iii) Afford reasonable opportunities to all residents for educational, religious, vocational/work, and recreational activities.

*Accomplished since the contempt order was entered:* Separation between residents in treatment and those who have harassed treatment recipients was achieved shortly before the October 1999 hearing. A sweat lodge for Native Americans has been constructed and is in use; a well-qualified Native American chaplain is provided and his services and hours available are reasonable, bearing in mind that chaplains for other religions are provided on a comparable basis. One resident has described some difficulty in obtaining Kosher meals, but nothing in the record suggests a lasting problem in that regard. Educational and recreational activities are provided, and the opening of the resident store has provided job opportunities.

*Still to be done:* The institution's policies and procedures, including those concerning grievances, are being rewritten and need to be implemented. All parties recognize that the prompt and fair handling of grievances is an essential part of the treatment environment. Satisfaction of that requirement has been delayed by a number of false starts, and is overdue. Behavior management plans are still used at times in ways that are inconsistent with a treatment-oriented institution. Vocational and work opportunities need to be expanded.

(f) To initiate and implement program oversight both by an internal review process and by an external body, either through a licensing organization or another entity.

*Accomplished since the contempt order was entered:* This requirement was deemed satisfied at the time of the Novem-

ber 15, 1999, order but some ground has been lost.

*Still to be done:* The vacant resident advocate position must be filled; the advisory board must be fully informed and consulted about important projects; the defendants must give bona fide consideration to all recommendations of the advisory board, the IOC, and the ombudsman, so that the oversight system is actually implemented.

(g) In the foregoing respects, and in others previously ordered, to take all reasonable steps to bring a constitutionally adequate program into reality rather than merely describing it on paper.

*Accomplished since the contempt order was entered:* More has been achieved than in any other six-month period since the SCC was established.

*Still to be done:* The steps described above and in the special master's seventeenth report must be taken, with no backsliding on the items of progress to date.

10. In the past six months the defendants have worked diligently toward the goal of bringing the SCC program up to minimum professional and constitutional standards. As the special master has noted, the timelines were tight and "staff were pressed to complete the work that was required." Seventeenth report at 2. Shortfalls continue to exist in every area as the result of earlier failures to take the necessary steps, but these can be cured rapidly if the current energetic approach continues.

11. The defendants' efforts and progress since November 15, 1999, justify a modification of the contempt order, but do not justify dropping the sanction at this point or dissolving the injunction. To continue stimulating compliance while recognizing defendants' recent efforts, the contempt order should be modified to provide that (a) the sanction amount will accrue monthly but will not be paid pending further order of the court; (b) defendants will serve and file a monthly accounting show-

ing the names of the SCC residents, the number of days each was confined during the month, and the sanction amount accrued; (c) the accrued total will be cancelled or ordered paid depending on whether the defendants have completed or substantially completed their compliance with the injunction at or before the time of the next scheduled hearing; (d) the defendants will serve and file, in addition, a monthly report on injunction compliance progress; and (e) in the event of any further failure by defendants to take all reasonable steps within their power to comply with the injunction, the court at any time may make the sanction amount currently payable and/or may order other relief.

12. The parties have requested a hearing on November 8, 2000, in the event that the injunction is not dissolved now. Due to the trial judge's commitment to serve as a visiting judge in another district in the period October 30–November 17, 2000, and to pre-existing commitments of the special master, a further injunction compliance hearing should be set for December 5, 2000, with the special master to visit the SCC in the week of November 6 and to file a report, after getting comments from the parties, on November 28, 2000. The special master is also authorized to observe the IOC inspection that is expected to take place this summer.

13. Any party may move at any earlier time for dissolution of the injunction, for additional sanctions, or for other relief.

### V. CONCLUSIONS OF LAW

1. The court has jurisdiction herein pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

2. The court adopts by this reference the conclusions of law set out in the order of November 15, 1999.

■ 3. As set out in the foregoing findings of fact and in earlier orders, the defendants have failed to make constitutionally adequate mental health treatment

available to the SCC residents, and have departed so substantially from professional minimum standards as to demonstrate that their decisions and practices were not and are not based on their professional judgment.

4. Injunctive measures ordered against a state agency or official ordinarily must be no broader than necessary to remedy the constitutional violation, but a remedy may go beyond the precise terms of the specific violation "when there is a record of past constitutional violations and violations of past court orders." *Gary v. Hegstrom,* 831 F.2d 1430, 1433 (9th Cir. 1987) (quoting *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982)). The court may "order relief that the Constitution would not of its own force initially require if such relief is necessary to remedy constitutional violations." *Gluth v. Kangas,* 951 F.2d 1504, 1510 n. 4 (9th Cir.1991) (quoting *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir.1986)). The orders of November 25 and December 23, 1998, and May 27, 1999, listed specific steps to be taken that were within the scope of the injunction as originally issued.

5. The test for determining contempt is "whether the defendants have performed 'all reasonable steps within their power to insure compliance'" with the order. *Stone v. City of San Francisco,* 968 F.2d 850, 856 (9th Cir.1992). The contempt "need not be willful." *In re Crystal Palace Gambling Hall, Inc.,* 817 F.2d 1361, 1365 (9th Cir.1987). "[T]here is no good faith exception to the requirement of obedience to a court order." *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1323 (9th Cir.1998). The party alleging civil contempt must demonstrate by clear and convincing evidence that the parties to be held in contempt violated the court's order. *See Federal Trade Comm'n v. Affordable Media, LLC,* 179 F.3d 1228, 1239 (9th Cir.1999). The burden then shifts to the alleged contemnors to demonstrate why they were unable to comply. *Id.* A party's inability to comply with a court's order constitutes a defense to a charge of civil contempt. *Id.*

6. The purpose of civil contempt is not to punish but "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Whittaker Corp. v. Execuair Corp.,* 953 F.2d 510, 517 (9th Cir.1992). *See also International Union, United Mine Workers v. Bagwell,* 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). While the court must use the "least possible power adequate to the end proposed," *Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990), it also "must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Whittaker,* 953 F.2d at 516. Defendants' footdragging is an important factor in weighing the use of a contempt sanction. *See Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 476–77, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (upholding affirmative action plan and fine imposed by the district court and stating that "[i]n light of petitioners' long history of 'foot-dragging resistance' to court orders, simply enjoining them from once again engaging in discriminatory practices would clearly have been futile").

7. Civil contempt is purged when the contemnor complies, or substantially complies, with the injunction. *N.L.R.B. v. A-Plus Roofing, Inc.,* 39 F.3d 1410, 1418 (9th Cir.1994). *See also Halderman v. Pennhurst State Sch.,* 9 F.Supp.2d 544 (E.D.Pa. 1998) (involving a state institution for the mentally retarded). Neither point has been reached by defendants herein, although important progress has been made.

8. Defendants' recent efforts and improvements, although they do not justify dissolving the injunction or dropping the sanction at this point, justify a modification of the contempt order to the extent set forth below. *See United States v. Tennes-*

*see,* 925 F.Supp. 1292, 1312 (W.D.Tenn. 1995).

## VI. ORDER

On the basis of the foregoing findings of fact and conclusions of law, it is ordered that:

1. Defendants' motion to dissolve the injunction is denied, and plaintiffs' motion for sanctions is granted in part and denied in part.

2. The contempt of court found on November 15, 1999, not having been purged, but defendants having made a genuine and sustained effort to comply with the injunction, and having made substantial progress toward full compliance, the sanction order is modified as follows: A sanction amount of $50 per day per resident confined at the SCC on that day will accrue for each day commencing May 8, 2000. Beginning on June 15, 2000, and on the fifteenth of each month thereafter until the sanction is removed, the defendants will serve and file an accounting for the preceding month showing the names of the SCC residents, the number of days each was confined during the month, and the sanction amount accrued. The accrued total will be cancelled, or ordered paid to the residents or into the registry of the court for their benefit, depending on whether the defendants have completed or substantially completed their compliance with the injunction at or before the time of the next hearing. The sanction proceeds will not be subject to a lien or claim by the State for the costs of confinement, evaluation, or care pursuant to RCW 71.09.110, Wash. Admin. Code § 275–155–060, or any other statute or regulation. The defendants will serve and file, in addition, on the fifteenth of each month beginning with June 2000, a report on injunction compliance progress. In the event of any further failure by defendants to take all reasonable steps within their power to comply with the injunction, the court at any time may make the sanction currently payable and/or may order other relief.

3. Defendants again are enjoined to comply fully with the injunction herein, as detailed in the orders entered on November 25 and December 23, 1998, and November 15, 1999, and in doing so to use the assistance provided by the special master.

4. A further report by the special master will be due on November 28, 2000, and will be provided to the parties in draft form, before that date, for their comments. A hearing as to injunction compliance will be held at 8:45 a.m. on December 5, 2000. Any party may move for contempt, dissolution of the injunction, or other relief before the scheduled hearing.

## APPENDIX A

## PROFESSIONAL STANDARDS

1. *Staff training and supervision*

- Program staff are adequately trained to provide residential care and treatment components

- Clinical direction and supervision are consistently provided by qualified professionals

- All staff understand the treatment model, structure, and their roles

- Treatment planning and clinical decisions are consistent across teams

2. *Treatment components and measures of progress*

- Treatment plans are individualized and comprehensive

- Program offers the components that are typically provided in institutional programs

- There is ongoing monitoring of services to ensure quality and consistency

- Systematic measures of progress are used, and feedback is regularly provided to participants

- The program has identifiable phases, including community release program

### 3. *Treatment environment*

- Program is housed in treatment-oriented (not punitive) environment
- Adequate space is provided for living, treatment, other activities, and for separation among resident groups
- Behavior of all staff is therapeutic and professional
- Program policies are consistently enforced
- Residents are treated with respect, and have opportunities to have their grievances addressed
- Program addresses long-term care needs of those who are not engaged in treatment activities

### 4. *Mental health program model*

- Program has internal review procedures

(QA/QI, protection of residents' rights, policy review and compliance, internal investigation of incidents)

- Program has external oversight, either through licensing organization or other entity

(Governing body, inspections by outside professionals, Ombudsman services, external investigation of incidents)